IN RE the MARRIAGE OF:

Lori LONG f/k/a Lori Ardestani, Petitioner-Appellant,

v.

Mohammad ARDESTANI, Respondent-Respondent.

Court of Appeals

*No. 00–1429. Oral argument December 18, 2000.—Decided January 25, 2001.*

2001 WI App 46

(Also reported in 624 N.W.2d 405.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Lynn M. Rider* of *Czajkowski & Rider, S.C.* of Prairie du Chien.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Michael B. Apfeld* of *Godfrey & Kahn, S.C.* of Milwaukee.

A brief was filed by the guardian ad litem, *Gregory S. Bonney* of *Johns, Flaherty & Rice, S.C.* of La Crosse.

Before Vergeront, Roggensack and Deininger, JJ.

¶ 1. VERGERONT, J. Lori Long appeals a trial court order denying her motion to prohibit her former husband, Mohammad Ardestani, from traveling to Iran with their minor children to visit his family. She contends the trial court erroneously exercised its discretion when it refused to grant a continuance to permit a key witness to testify, erred by placing the burden on her to prove that it was likely that Ardestani would not return with the children, and erred by failing to consider the best interests of the children. She and the guardian ad litem ask this court to rule, as a matter of law, that, if a parent objects to the other parent taking their children to visit a country with which the United States does not have diplomatic relations and which is not a signatory to the Hague Convention on the Civil Aspects of International Child Abduction, the parent may not take the children to that country to visit.[1]

---

[1] The purpose of the Hague Convention on the Civil Aspects of Child Abduction is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Mezo v. Elmergawi*, 855 F. Supp. 59, 62 (E.D.

¶ 2. We conclude the trial court did not erroneously exercise its discretion in refusing to grant a continuance; properly placed the burden on Long, as the moving party, to show that it was not in the children's best interests to travel to Iran with their father to visit his family; and properly considered the children's best interests in ruling on the motion. We decline to adopt the proposed ruling of law because we conclude that the existing standard of the best interests of the child, applied by trial courts in the exercise of their discretion, already allows for full consideration of all relevant concerns. Because the trial court properly exercised its discretion in its application of the best interests standard, we affirm.

## BACKGROUND

*Motion to Prohibit Travel*

¶ 3. Ardestani was born in Iran and moved to the United States in 1978 when he was twenty-eight years old. He and Long were married in 1980 and have four children: Shiva, d/o/b 5/24/82; Maria, d/o/b 10/22/84; Farshaun, d/o/b 7/02/88; and Kamran, d/o/b 4/01/90. Pursuant to the stipulated judgment of divorce, entered on July 22, 1999, in Crawford County, the parties have joint legal custody of the four children. Long has primary physical placement, with Ardestani to have placement every other weekend, every Tuesday and Thursday from 3:00 p.m. to 7:00 p.m., three to six weeks in the summer depending on the children's

N.Y. 1994) (citations omitted). The Hague Convention provisions apply only to those countries who sign it and thereby agree to abide by its terms. *Id.*

wishes, and certain holidays. The judgment of divorce also provided, pursuant to the parties' stipulation:

> H. In the event the respondent desires to take the minor children outside of the United States, he shall give sixty (60) days' notice of his intention to petitioner who then has thirty (30) days to move the Crawford County Circuit Court for an order prohibiting the trip or requiring the respondent to post a bond. In the event respondent desires to take the children to Iran for a summer vacation visit, respondent may have physical placement of the children up to six (6) weeks regardless of the respondent's placement entitlement under paragraph I.B.4. above provided, however, respondent shall not be entitled to any additional physical placement during the summer during which the Iranian visit occurs. If the Iranian vacation uses less physical placement time than the respondent is ordinarily entitled to under paragraph I.B.4., respondent shall receive the additional placements to which he is entitled.

¶ 4. In November 1999 after Ardestani told Long he intended to take the minor children to Iran to visit, Long moved the court for an order prohibiting Ardestani from removing the minor children from the United States. She asserted as grounds for the motion that Ardestani had repeatedly stated his intentions to take the children to Iran with him and not allow them to return; that, as a woman who was not a Moslem and not a citizen of Iran, she would not have standing in an Iranian court to demand the return of the children; and her remedies under international law were severely limited because the United States does not have diplomatic relations with Iran.

¶ 5. At the May 5, 2000 hearing on the motion, Long, represented by counsel, presented two witnesses

who testified on Iranian law as follows. Iran is not a signatory to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) and does not have diplomatic relations with the United States. Under Iranian law, which is based on the Koran, the mother's custody of children is restricted to the age of two for boys and seven for girls and, above those ages, the father has custody; the mother has no claim to custody.[2] If a mother has custody and physical placement of a child under an order of a court in the United States and the child is taken to Iran, the Iranian court does not give any weight to the United States court order, particularly if the mother is not a Moslem; if the father does not give permission to the child to leave Iran, the mother would not be permitted to take the child from Iran back to the United States. Boys need their father's permission to leave Iran up to a minimum age of eighteen, and girls need it regardless of age as long as they are unmarried. This would apply to Long's and Ardestani's children if they were in Iran, even though they are United States citizens and even though Ardestani is a United States citizen. Ardestani is still an Iranian citizen, the children are also Iranian citizens by virtue of their father's relation to Iran, and the children would be considered Iranian by Iranian authorities. If Ardestani were to die or become incapacitated or were not able to be contacted, his authority under Iranian law with regard to the children would transfer to the next male of authority within his family line.

---

[2] There was also testimony that the age at which transfer of custody from the mother to the father varied in different regions of Iran and could be older than seven, depending on the gender of the child.

505

¶ 6. Kristine Uhlman testified that a boy between the ages of twelve and fourteen can be drafted into the Iranian army, and this might interfere with a boy that age being able to leave Iran. According to Uhlman, Iranian families, in an effort to avoid having their boys drafted into the army, have sent them out of the country for education. She also testified that there is no existing legal mechanism that addresses the return of an abducted child if the child were taken to Iran. She agreed that, if Ardestani took the children to Iran, having the children returned would depend upon his good faith.

¶ 7. Long testified that she feared Ardestani would not return the children because, when she asked him for a divorce in May 1998 he said, "You know what will happen. And you haven't seen nothing yet." This meant to her that he would take the children to Iran and she would never see them, because in 1981 when she was pregnant with their first child and asked if she could have the child baptized, he made that threat explicitly saying, "If you don't raise them [sic] Moslem I will take the baby back to Iran and you'll never see it again." He also repeated that threat another time. Thereafter, during the course of their marriage when he wanted to control her he would say, "you know what will happen," and she understood he meant he would take the children and she would never see them. For this reason, when he said this in May 1998, she destroyed his American and Iranian passports and took other documents from his briefcase. During their marriage Ardestani also told her that men had sole custody of children in Iran and the mothers were never given custody. In 1997 he took the two girls, Shiva and Maria, for a visit to Iran, and when he came back he talked about some day moving to Iran: it was getting

506

better, more open, he said. In the period just before the divorce, he said if they were divorced, he was going to leave. He has told her he "has to save face," and he wants revenge.

¶ 8. Long acknowledged that Ardestani took Farshaun to Iran in 1991, when he was three, and the two girls in 1997, and there was no problem with him bringing them back. She is aware that Kamran wants to go with his father to Iran. She would encourage Ardestani to bring his parents to the United States, she would help him do this, and she would give him more time with the children then.

¶ 9. Ardestani, representing himself, testified as follows. He moved to Prairie du Chien in 1981 and began employment at 3M. He is still employed there, now working as an operator, and has a pension plan. He denied that he ever told Long that if they got a divorce, he would take the children away. He described himself as a citizen of this country who lives and works here and helps the community. His brother and sister-in-law live here and own real estate as part of their business, and they have a child. He is trying to help his sister come here. He wants his children to see their grandparents, aunts, uncles, and cousins; his mother is ill and that is why he wants to take the children now, especially Kamran, who has not seen her. Ardestani stated he would like to take all the children, if they wanted to go, and he had four weeks of vacation time which he would like to spend there.

¶ 10. Ardestani testified that he would not separate his children from their mother or from this country. Ardestani agreed it would be devastating to the children if they were taken to Iran and not allowed to return. He will do whatever is necessary to guarantee that they will come back safely, including signing

over his pension, and his brother would also come to court and guarantee. He, Ardestani, has his retirement and career here, ten years left to work, and he is not going to give them up.

¶ 11. In response to the guardian ad litem's questions, Ardestani explained that he has looked into bringing his parents to the United States. However, they would have to apply for a permanent residency and they do not want to live here because they are old. Also, he has to have a certain amount of income for each family member he wants to bring here, and he has only enough for one person. He talked about it with his family and they decided it made more sense to take the children to Iran so they could see the whole family, rather than bringing just one person here to see the children. In response to a question on the possibility of his parents meeting his children in a third country, Ardestani testified that his parents could not travel on their own to a third country; it would be too expensive; and he wants the children to see his culture, where he was born and where he lived. Farshaun was too young to remember and Kamran has never been there.

¶ 12. The therapist who had been meeting with Farshaun and Kamran since November 1999 also testified. (She had also met with Ardestani and with Long.) The boys' concern about their father's expressions of anger had been alleviated for a number of reasons, they were doing well, and they probably needed no more counseling except a session for closure. She had discussed a possible trip to Iran with them. Kamran was excited to go; Farshaun said he did not know if he wanted to be gone that long from his friends and activities, which the therapist described as a typical reaction for an eleven year old. The boys told her that some people believe their father would not bring them back,

but Kamran said if something happened and they could not get back with their father, he believed their uncle, who lives in Prairie du Chien, would come to get them. Both boys are close to their uncle.

¶ 13. The therapist testified that she has no reason to believe that Ardestani would want to separate the children from their mother. Her view was that Ardestani has the ability now to concentrate on what is best for his children and to set aside the feelings he had about their mother and the divorce. The therapist's concern, she explained, is what would happen if a tragedy occurred in Iran, given that it has no diplomatic relations with the United States. However, because Ardestani has a brother here, and four younger siblings in Iran, there would probably be family who would help the children come back to their mother. She agreed that it would be emotionally devastating to the children if their relationship with their mother were severed because Ardestani decided to keep them in Iran.

¶ 14. After the evidence, the guardian ad litem recommended that the children and Ardestani be accompanied to Iran by a trusted adult male relative, preferably their uncle who lives in Prairie du Chien, and that the trip be limited to three weeks.

¶ 15. The court first decided that because Shiva was soon to be eighteen, it was up to her if she wanted to go with her father to Iran: the court would neither require nor prohibit that. The court then ruled that the burden was on Long, the moving party, to show that Ardestani should be prohibited from taking the other children to Iran. Next, the court determined that if Ardestani took the children to Iran and decided not to return, there would be little that could be done to return the children to the United States. The court

acknowledged the serious harm that would result should this occur. The court found that Long really was afraid that Ardestani might keep the children in Iran, and she was not acting to harm or get even with Ardestani. However, the court decided that in order for Long to prevail on her motion, she had to do more than show she had a genuine fear that Ardestani would keep the children in Iran and that the harm if he did keep them, because of her lack of recourse, would be great. The court identified the critical question as the likelihood that Ardestani would keep the children in Iran, and it then reviewed the evidence going to that question.

¶ 16. The court described Ardestani's statements that were the basis for Long's fears as "not very specific in recent years," and as generally concerning his authority as the father and husband. The court found that much of Ardestani's conduct and statements upon which Long's belief was based were part of the culture from Iran that Ardestani still carried with him, and were not evidence he was going to take the children from their mother. Against that conduct and statements, the court weighed Ardestani's statements made "numerous times" that he has no intention of fleeing the country with the children and no motive to do so. The court also referred to psychological evaluations of Ardestani, which did not provide a basis for concerns about his personality or psychology in relation to the issue before the court, and to the therapist's testimony that she did not have a concern that Ardestani would try to keep the children from their mother. For these reasons, the court determined Long had not proved there was a likelihood Ardestani would not return the children. However, the court did permit Long to exer-

cise some type of control over Ardestani's pension, if she chose.

¶ 17. The written order entered by the court on May 22, 2000, denied Long's motion and directed that, upon her request, Ardestani was to provide and sign all documents with respect to his pension and retirement benefits necessary to provide Long with security to insure the return of the children.[3] Three days later Ardestani filed a performance bond with the court, assigning his entire interest in his 3M pension, retirement, and voluntary investment program benefits to the Crawford County Clerk of Courts for the benefit of Long; the assignment was to terminate when he returned the children and, if he did not, distribution was to be made to Long as if he were deceased and she his sole beneficiary.

*Motion for Reconsideration*

¶ 18. Long appealed the trial court's order and asked the trial court, pending appeal, to prohibit Ardestani from taking the children out of the United States. The court denied the motion, and Long sought the same relief in this court. At oral argument on her motion in this court, Long argued, among other points, that the trial court did not consider the evidence presented at the May 5 hearing on the conscription of twelve- to fourteen-year-old boys by the Iranian government. The guardian ad litem informed us that,

---

[3] The order also directed the minor children's passports to be held by the court until they reach eighteen at which time the passports will be released to the children, with release to either parent before then being on court order. Release to Ardestani was specifically ordered to facilitate the trip to Iran during the summer of 2000.

based on the information about the draft, which he did not remember from the May 5 hearing, his recommendation had changed and he now recommended that neither of the boys travel to Iran. Since the court reporter had not yet had time to prepare the transcript from the May 5 hearing, we were unable to determine what testimony had been presented on conscription at the May 5 hearing.[4] Long presented to this court an affidavit from Uhlman averring it was her understanding that boys twelve and older were routinely drafted into the military by the Iranian government, and the United States citizenship of a boy would not protect him from the draft. This affidavit had not been presented to the trial court.

¶ 19. On June 19, 2000, we remanded the matter to the trial court to allow Long to bring a motion for reconsideration so the trial court could consider evidence on conscription into the Iranian army and consider the guardian ad litem's changed recommendation. We imposed a short time period for bringing the motion and for preparation of the May 5 transcript, and ordered Ardestani not to remove the children from the country until further order from this court.

¶ 20. At the June 23, 2000 hearing on remand, Ardestani, still proceeding pro se, presented testimony by telephone from K. Alipour. Alipour testified he was in charge of legal affairs of the Iranian Interests Section in the Pakistani Embassy. He was born and raised in Iran and served in the Iran military. According to the Iranian law and constitution, Iranian male citizens

---

[4] The transcript then before us from the hearing in the trial court on relief pending appeal showed Long's counsel made the argument about the conscription evidence, and both the trial court and the guardian ad litem indicated they did not recall that evidence.

are eligible for the draft at age eighteen if they are not continuing their education. This has been the law since the end of the Iran-Iraq war. During that war, 1980–87, young males below eighteen voluntarily served in the military. Ardestani's sons are not eligible for the draft until they are eighteen, and until that age, they can travel freely in and out of Iran. Alipour was aware of no law that would allow the Iranian government to detain children between the ages of twelve and fourteen so that they would not leave the country prior to being eligible for military service and he was aware of no practice of doing that. If something happened to Ardestani while he was in Iran with his children, their mother could go to get them or a close relative could send them back to the United States. The Iranian Interests Section issues visas in the United States for travel to Iran that contain stamps granting permission to leave Iran without getting authorization in Iran. Many American citizens are now traveling to Iran on such visas.

¶ 21. After Alipour's testimony, the hearing concluded for the day and was continued to June 28, 2000. At the beginning of the hearing on June 28, Long's counsel asked for a continuance. She explained that Uhlman had been prepared to testify on June 23, but was then scheduled to travel and testify on another matter, and she had not heard back from Uhlman in response to telephone calls and faxes to arrange for her testimony on June 28. Long's counsel did have two dates, July 3 and July 10, on which Uhlman could testify by telephone. Long's counsel also explained that she was attempting to obtain more information in response to Alipour's testimony, but she had not been able to complete that effort. The guardian ad litem joined in the request for a continuance.

¶ 22. The court denied the request for a continuance because this court had ordered the transcript for the hearing on remand to be filed by July 10. The trial court stated it understood the reason this court wanted to expedite the matter, observing that, in response to the order entered by this court, Ardestani had to change his plane tickets to a date uncertain at a financial cost.

¶ 23. The trial court did receive Uhlman's affidavit as evidence, while acknowledging it was hearsay, and did allow Long's counsel to make an offer of proof on what Uhlman's testimony would be. According to the offer of proof, Uhlman would testify as follows. She has specific information that there were teenagers who served in the Iranian army under the age of eighteen. She has information or is under the impression that boys were detained between the ages of twelve and fourteen so they would be available for military service at a later age. She had a case in which an Iranian/American wanted to travel with his son at age eleven or earlier to Iran because he would not be comfortable once his son turned twelve. It is common practice that teenagers are sent out of the country during their teenage years to avoid the possibility of draft. It is possible the constitution sets the age for draft at eighteen, but Iran changes its law by decree, so if there were a reason to have more young people in the military, the age could change by decree. She knew of no specific instance in which a teenager came to Iran for a visit in a situation such as this and was drafted into the military service.

¶ 24. In response to the court's questions, Long's counsel stated she had not asked Uhlman whether her knowledge of boys under eighteen serving in the military was based on the time of the Iran-Iraq war.

¶ 25. The court denied Long's motion for recon-
sideration. The court found there was not "a reasonable
possibility," it was "not likely" and not "probable to any
reasonable degree" that Ardestani would keep the chil-
dren in Iran. The court referred to Ardestani's pledge of
his retirement benefits, the many years he had lived
here, his relatives here, and his children that would not
be going.[5] The court rejected the argument that,
because the harm to the children if they were retained
in Iran would be so devastating, the mere possibility of
that occurrence was sufficient to prevent Ardestani
from taking the children to Iran, regardless of the like-
lihood of that occurrence. With respect to the issue of
the draft, the court discussed Uhlman's affidavit and
offer of proof and Alipour's testimony, as well as Long's
arguments that Alipour's testimony was not credible.
The court determined that Alipour's testimony was
credible and logical, observing that Alipour provided
explanations for his statements. The court found that
"during these times" there was not a reasonable likeli-
hood or probability that the children would be drafted
during their trip to Iran with their father.

¶ 26. With the transcripts of the May 5 hearing
and the hearing on remand before us, we entered an
order granting the relief Long sought pending disposi-
tion of the appeal, and we expedited the briefing
schedule.[6]

---

[5] Although Long's motion and the court's order denying it
referred to "the minor children," it appears Ardestani made
specific plans to take only Farshaun and Kamran.

[6] One of the issues to be decided on appeal—whether
Ardestani should be permitted to take the children to Iran, even
if he intends to bring them back, because there is no legal
mechanism to effectuate their return if something happens to
him—is an issue of first impression in Wisconsin. We therefore

## DISCUSSION

*Continuance*

¶ 27. Long contends the trial court erred in denying her request for a continuance of the hearing on her motion for reconsideration so that Uhlman could testify. We disagree.

¶ 28. A motion for a continuance is directed to the sound discretion of the trial court. *State v. Anastas*, 107 Wis. 2d 270, 272, 320 N.W.2d 15 (Ct. App. 1982). We affirm discretionary decisions when the trial court examines the relevant facts, applies the correct legal standard, and uses a rational process to reach a conclusion a reasonable judge could reach. *F.R. v. T.B.*, 225 Wis. 2d 628, 637, 593 N.W.2d 840 (Ct. App. 1999).

¶ 29. In its order remanding to the trial court, this court imposed a strict time schedule for proceedings in the trial court because we were at the same time temporarily prohibiting Ardestani from leaving the country, even though we had not yet decided Long was entitled to such a prohibition pending appeal. The specific purpose of the remand was to provide Long with an opportunity to more fully develop the record with Uhlman's testimony. We recognize Long arranged for Uhlman to testify by telephone on the first day of the hearing on remand, and it was not through any fault of Long or Uhlman that Uhlman did not testify that day. However, the trial court accurately understood the

---

appointed counsel to represent Ardestani from the Volunteer Pro Bono Program established by the Wisconsin State Bar Appellate Division. Subsequently, we denied Ardestani's motion to vacate the order prohibiting him from removing the children from this country pending disposition of the appeal.

importance this court placed on an expeditious proceeding on remand. The trial court also correctly perceived that, if it granted the continuance, it would not be able to meet the deadline we had imposed after already granting one request for an extension due to the court reporter's difficulty in meeting the first deadline we set.

¶ 30. Moreover, the trial court accommodated Long's desire to provide additional information from Uhlman by agreeing to consider the contents of Uhlman's affidavit and Long's offer of proof. At oral argument in this court, Long's counsel stated she had no information from Uhlman other than that which was presented to the trial court by affidavit and offer of proof. Therefore, Long has not established that a continuance would have produced evidence from Uhlman that the court did not already have from her affidavit and the offer of proof.

■

¶ 31. Under these circumstances, we have no hesitancy in concluding the trial court properly exercised its discretion in denying the continuance.

*Burden of Proof*

¶ 32. Long next argues the trial court improperly placed the burden of proof on her, rather than Ardestani, to prove he should be prohibited from taking the children to Iran.[7] She contends the issue, properly

---

[7] In its decision on remand, the trial court stated:

And it is the petitioner who must make a showing that it is likely. I guess it is burden of proof here is, perhaps, an issue that was mentioned before the Court of Appeals. But whatever the burden is, you haven't met it because it's not been shown to be likely. It's a mere possibility. As Mr. Ardestani says it's possible he could, someone go outside the courtroom and be struck by a car today. It could

framed, is whether it is in the children's best interests to go to Iran with their father, and this issue was not litigated in the divorce proceedings; rather, the parties stipulated to preserving this issue for later determination by the court. Therefore, according to Long, the court is really making an initial determination on the best interests of the children, and both parties have an equal burden of showing what is in the best interests of the children. Long relies on *Gochenaur v. Gochenaur*, 45 Wis. 2d 8, 172 N.W.2d 6 (1969), and *Pamperin v. Pamperin*, 112 Wis. 2d 70, 331 N.W.2d 648 (Ct. App. 1983), for her position. We conclude neither case advances Long's position.

¶ 33. In *Gochenaur* the court held that a parent moving for custody of her children, after she stipulated to custody with the father, did not have the burden of proving a change of conditions because the court had not made a full inquiry into, and a determination of, the children's best interests. *Gochenaur*, 45 Wis. 2d at 18–19. However, in *Corcoran v. Corcoran*, 109 Wis. 2d 36, 42, 324 N.W.2d 901 (Ct. App. 1982), we held that WIS. STAT. § 767.32(2) (1979–80), governing modification of custody orders (and enacted after *Gochenaur*

happen. You try to bootstrap onto that the risk is too great, that there is any possibility that the risk is too great. I do not believe that is correct. And, so, it is not likely. It is not probable.

Ardestani reads this statement to mean that the trial court's decision would be the same no matter which party had the burden of proof. Long, as her counsel explained at oral argument, understands the trial court to mean that, whatever the degree of certainty Long had to meet to fulfill her burden of proof, she had not met it. In Long's view, the trial court is still adhering to its statement in its May 5 ruling that she had the burden of proof. Because we review de novo the question which party has the burden of proof, we need not resolve these conflicting interpretations.

was decided), did not treat stipulated custody awards differently than custody awards after litigation. Therefore, *Gochenaur* is no longer the law regarding modifications in custody or placement orders. In any event, Long's motion did not seek a modification of any provision in the divorce judgment, but was brought pursuant to one of those provisions on an issue not decided in the judgment.

¶ 34. The statement in *Pamperin* on which Long relies also is not relevant to this case. In *Pamperin* we stated that when the court makes an initial determination of custody, each party bears an equal burden to show an award of custody to that party is in the child's best interest. *Pamperin*, 112 Wis. 2d at 74–75.[8] In this case, the initial determination of custody and placement was already made in the judgment of divorce.

¶ 35. The guardian ad litem, while also contending the court erred in placing the burden of proof on Long, takes a different position of the correct rule. The guardian ad litem contends that, when one parent wishes to travel with his or her children over the objection of the other parent to a country that is not a signatory to the Hague Convention, the parent who wishes to make the trip should have the burden of proving the trip should be allowed.

■

¶ 36. Which party has the burden of proof presents a question of law, which we review de novo.

---

[8] We noted in *Pamperin v. Pamperin*, 112 Wis. 2d 70, 74–75 n.2, 331 N.W.2d 648 (Ct. App. 1983), that our instruction to the trial court on the prior appeal in the same case—that this standard should be used because the parties had stipulated to custody—was in error in light of *Corcoran v. Corcoran*, 109 Wis. 2d 36, 42, 324 N.W.2d 901 (Ct. App. 1982), but that it was nonetheless binding as law of the case.

*Wolfe v. Wolfe*, 2000 WI App 93, ¶ 14, 234 Wis. 2d 449, 610 N.W.2d 222. We are persuaded that the trial court correctly concluded Long had the burden of proving that prohibiting Ardestani from taking the children to visit his family in Iran was in the children's best interests.

¶ 37. The general rule is that the party seeking judicial process to advance a position carries the burden of proof. *Id.*[9] In this case Long is seeking a court order prohibiting Ardestani from taking the minor children to Iran for a visit. She is doing so consistent with the procedure the parties stipulated to, which was incorporated in the judgment of divorce. Under that procedure Long has the obligation to move the court to prohibit Ardestani from taking the children to Iran; Ardestani's only obligation before taking the children is to notify Long sixty days in advance of his desire to

---

[9] In *Wolfe v. Wolfe*, 2000 WI App 93, ¶ 15, 234 Wis. 2d 449, 610 N.W.2d 222, we concluded that, although the father, who had not had contact with his son, brought a motion seeking minimal contact, the mother had the burden of proving endangerment under WIS. STAT. § 767.24(4)(b) (1997–98). (This section provides that a child is entitled to physical contact with both parents unless, after a hearing, the court finds "physical placement with a parent would endanger the child's physical, mental or emotional health.") We concluded the mother bore the burden, even though the father brought the motion, because, under the statute, the court could not deny his motion unless it found endangerment, and the mother was the party advancing that position. *Wolfe*, 2000 WI App 93 at ¶ 15. Whether this conclusion conflicts with our statement in *Sterlingworth Condo. Ass'n, Inc. v. DNR*, 205 Wis. 2d 710, 726, 556 N.W.2d 791 (Ct. App. 1996), that "[t]he customary common-law rule [is] that the moving party has the burden of proof, including not only the burden of going forward but also the burden of persuasion," is an issue we need not decide in this case.

take the children. The same stipulated provision also specifies the length of such a visit and its effect on the placement schedule. This indicates the parties contemplated that, if Long did not move the court to prohibit Ardestani, he could take the children without seeking any court approval, consistent with the terms of the provision.

¶ 38. This procedure is similar to that in the statute governing situations in which a parent wishes to remove a minor child from the state of Wisconsin for a period of more than ninety consecutive days and the other parent has periods of physical placement. WIS. STAT. § 767.327 (1999–2000).[10] The parent wishing to do so must give the other parent notice at least sixty days in advance to allow the other parent to object. Section 767.327(1). A parent wishing to prohibit the removal must do so by motion to the court and has the burden of proof to show prohibition is in the children's best interests. Section 767.327(3)(c)2.

¶ 39. There is no statutory provision prohibiting a parent with joint legal custody and physical placement from taking the child on a visit outside Wisconsin, including to a foreign country, for less than ninety days. Also, in the absence of a provision in the divorce judgment to the contrary, there is no reason a parent with joint legal custody may not take a child on a visit to another country during the child's physical placement with that parent, without the other parent's permission, as long as the visit is less than ninety days.

---

[10] WISCONSIN STAT. § 767.327(1)(a)2 (1999–2000) also governs situations in which one parent wishes to establish legal residence with the child outside the state or within a distance of 150 miles from the residence of the other parent. All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 40. We conclude that, when parents have agreed, as they have here, that one parent must move the court to prohibit the other from taking a particular trip with the children, the moving party has the burden of proof—both the burden of producing evidence and the burden of persuading the court that prohibiting the trip is in the children's best interests. Although the guardian ad litem urges us to adopt a different rule when the trip is to a country that is not a signatory to the Hague Convention, he provides us with no case law authority for such a rule.[11] Moreover, in the one article brought to our attention that addresses the question of burden of proof—Susan L. Barone, *International Parental Child Abduction: A Global Dilemma With Limited Relief—Can Something More Be Done?*, 8 N.Y. INT'L L. REV. 95, 118 n.199 (1995)—the author "proposes that the threatened parent should have the burden of proving an abduction threat by a preponderance of the evidence."

*Best Interests of Children*

¶ 41. The best interests of the children is the dominant concern in any decision in divorce actions affecting custody or physical placement of children. *Racine Family Court Comm'r v. M.E.*, 165 Wis. 2d 530, 536, 478 N.W.2d 21 (Ct. App. 1991). Long argues the trial court failed to consider the best interests of the children in making its ruling. If Long means the trial

---

[11] We discuss the two cases the guardian ad litem cites, *Al-Zouhayli v. Al-Zouhayli*, 486 N.W.2d 10 (Minn. Ct. App. 1992), and *Soltanieh v. King*, 826 P.2d 1076 (Utah Ct. App. 1992), later in this opinion.

court did not apply the standard of the best interests of the children, we disagree.

¶ 42. The parties' arguments to the court at both the May 5 hearing and on the motion for reconsideration make clear that the parties and the court understood the issue was whether it was in the children's best interests to go to Iran with their father. There was evidence that it would be beneficial for the children to travel with their father to the country of his birth and visit his family with him, assuming the children were returned, and there was no evidence to the contrary. There was no dispute it would be devastating to the children if they were not returned. We agree with the trial court and Ardestani that it was necessary for the court to consider not only the benefit to the children of going and the harm to them if they were not returned—neither of which were disputed—but also the likelihood of their not returning, which was the central factual dispute in this case. Accordingly, the evidence and the trial court's decision were focused on this dispute. However, this focus does not mean the trial court was not ultimately deciding what was in the children's best interests.

■■■■

¶ 43. We understand Long to also argue that the trial court erred in applying the best interest standard because it did not give proper weight to the devastating effect on the children if they were not returned to their mother in the United States. Because the determination of a child's best interests depends on firsthand observations and experience with the persons involved, it is committed to the trial court's discretion. *F.R. v. T.B.*, 225 Wis. 2d 628, 637, 593 N.W.2d 840 (Ct. App. 1999). We therefore examine the trial court's ruling to determine whether it properly exercised this discre-

tion. In doing so, we are mindful that assessing the credibility of witnesses and weighing their testimony are functions of the trial court, not this court, and we do not reverse the trial court's findings of fact unless they are clearly erroneous. WIS. STAT. § 805.17(2); *State ex rel. T.R.S. v. L.F.E.*, 125 Wis. 2d 399, 401, 373 N.W.2d 55 (Ct. App. 1985).

¶ 44. In this case the critical question of the likelihood of the children being returned has these component questions: (1) What is the likelihood that Ardestani will intentionally refuse to return the children or refuse to see that they are returned? (2) What is the likelihood that one or both boys would be detained by the Iranian government so that they could serve in the military? (3) What is the likelihood that, if Ardestani through accident becomes unable to return the children, they will be able to return nonetheless? (4) What legal mechanisms exist to insure that if Ardestani does intentionally refuse to return the children or see that they are returned, and if his relatives refuse to or are unable to see that they are returned, Long can nonetheless secure their return?

¶ 45. The trial court carefully evaluated Long's and Ardestani's testimony, and considered the other testimony and evidence presented relevant to Ardestani's intentions. The trial court found Ardestani intended to bring the children back as he said he would. This is a factual finding highly dependent on the trial court's assessment of the credibility of witnesses. There is ample evidence in the record to support such a finding, which the trial court explained. Therefore, we will not set aside this finding.

¶ 46. The trial court's finding that there is no reasonable likelihood of detainment for military service in Iran or of conscription was based on its

assessment of the persuasiveness of the testimony of Alipour as compared to the proffered testimony of Uhlman. Again, this is an assessment for the trial court to make, not this court, and we will not disturb it.

¶ 47. The court also considered the evidence on the question of what would happen if Ardestani was unable to bring the children back himself. It heard the testimony of the children's therapist, who had considered this question, and evidence that Ardestani had relatives both in Iran and in the United States who could help bring the children home. There was no evidence suggesting that any family member who would have authority over the children under Iranian law if something happened to Ardestani would not help them return to Long.

¶ 48. Finally, the court considered the undisputed evidence that Iran was not a signatory to the Hague Convention, it did not have diplomatic relations with the United States, and the courts of Iran would not recognize an order of a court of the United States awarding Long custody of her children. The court did not ignore this evidence, but forthrightly addressed it: the court acknowledged that it could not absolutely rule out the possibility that Ardestani would act other than as he promised, and, if this occurred, Long would be without a legal remedy and the effect on the children would be devastating. Ultimately, the court had to weigh the benefit of the children going to Iran with their father against the likelihood that they would not be returned, along with the harm to them if they were not returned. That weighing, we conclude, is part of the exercise of the trial court's discretion in deciding what is in the children's best interests. We are satisfied the trial court properly exercised its discretion in deciding

it should not prohibit Ardestani from taking the children to Iran.

¶ 49. Both Long and the guardian ad litem ask that we rule as a matter of law that a parent, even one having custody or joint custody, may not take a child to a country that is not a signatory to the Hague Convention if the other parent objects, even if a court finds the parent wishing to take the child intends to return the child and otherwise comply with court orders. They argue such a rule is good policy because the consequences of a failure to return the child in such situations are so severely adverse to the child.

¶ 50. However, none of the cases brought to our attention from other jurisdictions even hint at such a rule. Rather, in those cases in which courts have ordered restricted visitation in this country because of fear of abduction to another country,[12] or have prohibited a parent from taking a child to, or having visitation with the child in, another country,[13] the courts have examined the facts and circumstances of each case to arrive at the best interests of the child. In some cases the trial courts have found, based on the evidence, that there is sufficient likelihood a parent may flee the country with the child, as the other parent fears, to justify restrictions.[14] In others cases trial courts have found, based on the evidence, there is not a sufficient likelihood of that occurring to justify either supervised visitation in this country[15] or a prohibition on visita-

---

[12] *See, e.g., Soltanieh v. King*, 826 P.2d 1076, 1079–80 (Utah Ct. App. 1992); *Al-Silham v. Al-Silham*, No. 94–A–0048, 1995 WL 803808, at *2–*3 (Ohio Ct. App. Nov. 24, 1995) (per curiam).

[13] *See, e.g., Bergstrom v. Bergstrom*, 320 N.W.2d 119, 122 (N.D. 1982).

[14] See footnote 12.

[15] *See, e.g., Al-Zouhayli*, 486 N.W.2d at 13.

tion in another country.[16] The appellate courts in these cases have reviewed the trial courts' factual findings and discretionary determinations under deferential standards similar to those we have already enunciated in this case.

¶ 51. While in some cases the difficulty of obtaining the return of the child in the event of an abduction (because the other country is not a signatory to the Hague Convention or for other reasons) is one factor courts have considered in imposing restrictions, *see, e.g., Al-Silham v. Al-Silham*, No. 93–A–1770, 1994 WL 102480, at *1 (Ohio Ct. App. March 25, 1994), in no case of which we are aware is this the only factor. Indeed, the Minnesota Court of Appeals has specifically rejected such an argument in the context of deciding whether visitation in this country should be supervised or not. *See Al-Zouhayli v. Al-Zouhayli*, 486 N.W.2d 10, 13 (Minn. Ct. App. 1992) (decision whether to order supervised visitation depends on particular facts of the case and unwillingness of non-custodial parent's native country to enforce trial court's order is not controlling). In addition, none of the articles to which the parties have directed us suggest the adoption of a rule such as Long and the guardian ad litem propose.[17]

---

[16] *See, e.g., Markus v. Markus*, 427 N.Y.S.2d 625, 627 (N.Y. App. Div. 1980) (allowing visitation to Israel with conditions); *Lolli-Ghetti v. Lolli-Ghetti*, 556 N.Y.S.2d 324, 325 (N.Y. App. Div. 1990) (allowing visitation in Monaco and eliminating bond); *Hatzievgenakis v. Hatzievgenakis*, 434 N.W.2d 914, 917–18 (Iowa Ct. App. 1988) (allowing visitation in Greece upon posting of reduced bond).

[17] *See* Patricia E. Apy, *Managing Child Custody Cases Involving Non-Hague Contracting States*, 14 J. AM. ACAD. MATRIMONIAL LAW. 77 (1997); Susan L. Barone, *International Parental*

¶ 52. We are satisfied that the standard of the best interests of the child, comprehensive as it is, permits a full consideration of concerns both about a parent's intention in abducting a child and about the lack of a remedy should that occur. We are also satisfied that there is no need to alter the deference appellate courts give to trial courts' decisions on a child's best interests in order to insure a full consideration of those concerns.

¶ 53. The guardian ad litem suggests, as an alternative to adopting the rule of law he advances, that we provide guidance to trial courts by listing the factors they should take into account in deciding whether to permit one parent to take a child to another country for a visit, and that we remand to permit evidence on these factors. At oral argument the guardian ad litem mentioned such factors as: the intention of the parent to return with the child; methods of providing security that the parent will return with the child; the effect on the child; the desires of the child; the reason for the visit; and the current policies, laws, and practices of the country to which the parent wishes to take the child for a visit. While we can readily agree these are appropriate factors to consider in this case, and,

*Child Abduction: A Global Dilemma With Limited Relief—Can Something More Be Done?*, 8 N.Y. INT'L L. REV. 95 (1995); Monica E. Henderson, Note, *U.S. State Court Review Of Islamic Law Custody Decrees—When Are Islamic Custody Decrees In The Child's Best Interest?*, 36 BRANDEIS J. FAM. L. 423 (1997–98); and Mary A. Ryan, Statement before the Committee on International Relations United States House of Representatives Concerning Implementation of the Hague Convention on the Civil Aspects of International Child Abduction (Oct. 14, 1999), *at* http://travel.state.gov/101499mar.html.

perhaps in many others, we see no need to establish a definitive list of factors. The virtue of the best interests standard is that it permits the trial court to take into account all facts and circumstances bearing on the best interests of the particular child, and we view an attempt to define what those might be in a general category of cases as neither necessary nor fruitful.

¶ 54. We also see no need for a remand in this case. The trial court had before it evidence bearing on all the factors the guardian ad litem suggests are relevant, and it considered those factors in reaching its decision not to prohibit Ardestani from traveling to Iran with his minor sons. As we have already concluded, the trial court properly exercised its discretion in making that decision.

*By the Court.*—Order affirmed.