**IN THE COURT OF APPEALS OF IOWA**

No. 24-0420
Filed March 5, 2025

**IN RE THE MARRIAGE OF ZHENZHEN WANG
AND SHENGYI YE**

**Upon the Petition of
ZHENZHEN WANG,**
        Petitioner-Appellee,

**And Concerning
SHENGYI YE,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.

        A father appeals the legal-custody and visitation provisions of the decree

dissolving the parties' marriage.  **AFFIRMED.**

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        Mark Simons of Simons Law Firm, PLC, West Des Moines, for appellee.

        Heard by Greer, P.J., and Langholz and Sandy, JJ.

**LANGHOLZ, Judge.**

Zhenzhen Wang and Shengyi Ye were married in Iowa in 2008. They share two children—a son and a daughter. In 2019, Shengyi took a job as a professor in China, while Zhenzhen and the children remained in Iowa. Their relationship hit a breaking point in 2022, when an argument led to Shengyi leaving his wife and children stranded on the side of the road while they were visiting him in China. Before they made it back to his apartment, he took their travel documents from Zhenzhen's backpack and refused to return them, forcing Zhenzhen and the children to remain in China for six or seven months longer than they intended while Zhenzhen worked to obtain new passports. Zhenzhen soon petitioned to dissolve the marriage. And the district court eventually gave her sole legal custody of the children and required Shengyi to exercise his visitation only in the United States.

Shengyi appeals, arguing that he should be able to take the children to China for visitation and that joint legal custody is in the children's best interests. On our de novo review, we affirm. Because China is not a party to the Hague Convention, Zhenzhen would have no recourse should Shengyi refuse to return the children to the United States. And Shengyi has already once unilaterally kept the children from leaving China for more than half a year. So the restriction on his visitation prohibiting international travel is justified and in the children's best interests. As for legal custody, the district court identified a host of factors that overcome the statutory presumption for joint legal custody, including Shengyi's actions to prevent the children from leaving China, his significant geographic distance, his lack of active parenting, and his prior violence toward Zhenzhen. We thus agree that sole legal custody best serves the children.

## I.    Factual Background and Proceedings

Zhenzhen and Shengyi met while attending an academic conference in 2005.  They were both born, raised, and educated through college in China.  And they both attended graduate school in the United States—Zhenzhen received her Ph.D. from the University of Iowa and Shengyi received his Ph.D. from Dartmouth.  They married in Iowa City in 2008 and share two children: a son born in 2013 and a daughter born in 2015.  Both children perform well in school, are active in extracurricular activities, and are bilingual.

They moved from Iowa City to Johnston in 2015.  During this time, Shengyi worked as a research scientist for the University of Iowa and Zhenzhen transitioned from her position at John Deere to a role with Wells Fargo.  In early 2019, Shengyi was approached about teaching physics at a university in China.  They both believed the professorship was a great opportunity, so Shengyi relocated to China in the summer of 2019 and Zhenzhen stayed with the children in Johnston.

Around this time, Zhenzhen and Shengyi's relationship began to deteriorate.  The two fought about whether Zhenzhen should relocate with the children to China.  During one fight, Zhenzhen credibly described Shengyi pushing, strangling, and slapping her.  Communication between the two also diminished after Shengyi moved to China—Shengyi would call or video chat about once a week but would usually only speak with the children.  And when the COVID-19 pandemic took hold in 2020, Shengyi could no longer travel back to the United States.

In May 2021, Zhenzhen arranged to travel to China with the children to visit her parents and Shengyi. Though the trip was only planned for the summer, Zhenzhen extended the trip through the end of the year. By early 2022, she wanted to bring the children back to Iowa. Yet one day while driving in the car, Shengyi and Zhenzhen started fighting, which resulted in Shengyi abandoning Zhenzhen and the children on the side of the road. Zhenzhen took a taxi back to Shengyi's apartment, where she discovered Shengyi had removed the children's passports, travel documents, and birth certificates from her backpack. Though Shengyi at first denied taking the documents, he later refused to give them back, preventing Zhenzhen and the children from leaving the country.

It ultimately took Zhenzhen "six or seven months" to reorder all of the travel documents and return to Iowa. During this time, Zhenzhen and the children were living with her parents, but Shengyi never visited. He did speak with the children on the phone, telling them that Zhenzhen's actions were "illegal" and she was a "criminal."

Shortly after Shengyi took the children's travel documents, Zhenzhen petitioned to dissolve the marriage in Iowa district court. Shengyi then filed a competing lawsuit in China, which was ultimately dismissed. Shengyi originally contested whether Iowa had jurisdiction, but the supreme court denied his interlocutory appeal of the district court's ruling that it did have jurisdiction. *See In re Marriage of Wang & Ye*, No. 22-0989 (Iowa June 20, 2022).[1] And the matter proceeded to a hearing in December 2023.

---

[1] In this appeal, Shengyi no longer contests jurisdiction. And we are satisfied that the district court had jurisdiction. *See* Iowa Code § 598B.201(1)(a), (b) (2022).

The district court later issued a decree dissolving the parties' marriage. Relevant here, the decree placed the children in Zhenzhen's sole legal custody and physical care. As for Shengyi's visitation, the court explored the difficult question of where that visitation should occur—in China or in the United States. After considering Shengyi's prior conduct preventing the children from returning to the United States and that China may not enforce a United States custodial order, the decree required that Shengyi have visitation with the children only in the United States. And it provided him up to ten consecutive weeks of visitation with the children over the summer, and up to four weeks at a time should he travel to the United States during the school year.

Shengyi now appeals both the legal-custody and visitation provisions of the decree.

## II.     Visitation Outside of the United States

Shengyi does not contest placing the children in Zhenzhen's physical care. Instead, he challenges the decree's limitation that bars him from having visitation with the children outside of the United States. Because Shengyi and his extended family reside in China, he wishes for the children to spend their summer vacations with him in China. We review the district court's dissolution decree de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

When allocating physical care, "liberal visitation" should be afforded "where appropriate." Iowa Code § 598.41(1)(a) (2022). With the children's best interests as our guiding principle, courts strive to "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." *Id.* Still, "in some situations conditions [on visitation] are justified." *In re Marriage of*

*Rykhoek*, 525 N.W.2d 1, 4 (Iowa Ct. App. 1994). For instance, we have barred a parent "from removing the children from the state of their residence during visitation" after the parent "once failed to return the children after visitation." *Id.* at 4–5 (citing *In re Marriage of Smith*, 471 N.W.2d 70, 73 (Iowa Ct. App. 1991)).

Limiting a parent's ability to travel internationally with his or her children implicates heightened, and at times conflicting, interests. On the one hand, despite the virtues of our state, "[t]he world does not end at the borders of Iowa." *In re Marriage of Hatzievgenakis*, 434 N.W.2d 914, 917 (Iowa Ct. App. 1988). And children should not easily be denied the opportunity to build meaningful relationships with a parent who resides outside of the United States or "fully experience [their] dual heritage." *In re Marriage of Stern*, No. 13-2087, 2015 WL 568584, at *2 (Iowa Ct. App. Feb. 11, 2015). On the other hand, there may be "problems securing the return from a foreign country of a child to a custodial parent in the United States." *Hatzievgenakis*, 434 N.W.2d at 917 (discussing a prior case where a child was taken to Jordan and was not returned to Iowa for nearly two years, "despite numerous orders directing the father to return the child").

The Hague Convention on the Civil Aspects of International Child Abduction seeks to alleviate the risk of children being improperly held in a foreign country. *See* Hague Convention on the Civil Aspects of International Child Abduction, art. 1, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501. This international treaty sets "legal rights and procedures for the prompt return of children who have been wrongfully removed from one signatory nation or wrongfully retained in another." *In re Marriage of El Krim & Amin*, No. 16-1260, 2017 WL 2465806, at *5, n. 2 (Iowa Ct. App. June 7, 2017). Yet not every nation is a party to the Hague Convention—

China is not. *See China International Parental Abduction Information*, U.S. Dep't of State, Bureau of Consular Affs., https://perma.cc/8Y4J-F7HZ. And without that treaty, "there is no remedy" for a parent whose child is wrongly held in a nonsignatory country. *El Krim & Amin*, 2017 WL 2465806, at *5 n.2 (cleaned up).

States have taken different approaches to allowing visitation or travel to countries that are not parties to the Hague Convention. Michigan, for example, flatly prohibits courts from authorizing parenting time in nonsignatory countries unless both parents give written consent. *See* Mich. Comp. Laws § 722.27a(10) (2024). Other states have rejected bright-line travel limitations in favor of a holistic approach to the children's safety and best interests. *See, e.g.*, *Abouzahr v. Matera–Abouzahr*, 824 A.2d 268, 281–82 (N.J. Super. Ct. App. Div. 2003); *Moore v. Moore*, 349 P.3d 1076, 1080–84 (Alaska 2015); *In re Rix*, 20 A.3d 326, 329 (N.H. 2011); *Long v. Ardestani*, 624 N.W.2d 405, 416–19 (Wis. Ct. App. 2001); *Katare v. Katare*, 283 P.3d 546, 552–55 (Wash. 2012) (en banc).

Like many states, we have previously looked to the *Abouzahr* factors when weighing whether to limit foreign travel. *See Stern*, 2015 WL 568584, at *4. There, the court explained "[t]he danger of retention of a child in a country where prospects of retrieving the child and extraditing the wrongful parent are difficult, if not impossible, is a major factor for a court to weigh . . . , [b]ut it is not the only factor." *Abouzahr*, 824 A.2d at 282. On top of the foreign nation's signatory status, courts may also consider the parent's domicile, the reasons for visiting, the children's safety, the age of the children, the parents' relationship, the viability of bonds or other return measures, and "the character and integrity of the parent seeking out-of-country visitation as gleaned from past comments and conduct." *Id.*

Though no one factor is dispositive, cases upholding travel restrictions or conditions often turn on a demonstrated risk of abduction or nonreturn of the children. *See, e.g.*, *Katare*, 283 P.3d at 42 (affirming bar on father traveling with the children to India—a nonsignatory to the Hague Convention—for a father who made "credible threats to abscond with the children" and had a "pattern of abusive behavior"); *Bergstrom v. Bergstrom*, 320 N.W.2d 119, 122–23 (N.D. 1982) (affirming custodial order requiring mother's visitation be within the United States, in part because child feared she would not be returned to the United States); *Lehn v. Al-Thanayyan*, 438 P.3d 646, 653–55 (Ariz. Ct. App. 2019) (affirming requirement for father to post a $2.5 million bond before traveling with children to Kuwait because father's conduct showed a risk of not returning the children); *see also Keita v. Keita,* 823 N.W.2d 726, 732 (N.D. 2012) (reversing travel restriction where father's status as a "flight risk" was "without sufficient evidence in the record" and the district court's order contained "insufficiently detailed findings demonstrating the physical or emotional harm to the child likely to result from visitation").

Against this backdrop, we find the decree's travel restrictions are supported by the record and in the children's best interests. First, China is not a party to the Hague Convention. While this is not the "only factor" we consider, it is still a "major factor" when considering the potential safety and wellbeing of the children. *Abouzahr*, 824 A.2d at 282. Though Shengyi handwaves away this factor as noncontrolling, the risk of substantial harm to both the children and Zhenzhen if the children were kept outside of the United States with no available recourse is a material consideration when setting the bounds of visitation. *See* Iowa Code

§ 598.41(1)(a) (considering whether "direct physical harm or significant emotional harm to the child, other children, or a parent is likely to result from such contact with one parent").

Second, Shengyi has already tried to prevent the children from returning to the United States. In 2022, Shengyi took his children's travel documents and refused to return them, forcing them to remain in China. Shengyi's actions delayed Zhenzhen and the children's return to the United States by six or seven months. On appeal, Shengyi insists this incident did not occur—that Zhenzhen made it up and had intended to stay in China. He thus argues that there is no risk the children would not be returned to Iowa.

Yet the district court found Zhenzhen's testimony about this event to be "far more credible." And we see no basis to depart from that finding. Left as we are to "reading black words on a white page of a sterile transcript," this is precisely the kind of credibility determination best entrusted to the district court judge who had "front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). What's more, the record supports finding Zhenzhen's version of events more credible. So unlike cases where a parent could not point to any evidence supporting a fear of a child not being returned, *see Hatzievgenakis*, 434 N.W.2d at 917, Shengyi's prior conduct coupled with Zhenzhen's inability to obtain recourse tips heavily in favor of limiting visitation in China.

As for the remaining factors, the children are still young—eleven and nine years old—and thus have limited abilities to advocate for themselves should they be held beyond Shengyi's allocated visitation. Further, Shengyi's professorship

gives him a "long summer break from June until September." And he may have up to ten consecutive weeks of visitation over the summer, minimizing the need for undue travel back and forth between the United States and China.

At bottom, "[p]hysical care issues are not to be resolved based upon perceived fairness to the *spouses,* but primarily upon what is best for the *child.*" *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The visitation scheme here permits the children to spend meaningful time with their father while protecting their safety and well-being.[2] And so we affirm.

### III.  Legal Custody

Shengyi also challenges the district court's placement of the children in Zhenzhen's sole legal custody rather than in the parties' joint legal custody. Joint legal custody provides both parents with "legal custodial rights and responsibilities toward the child," including "equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3). Our statutory framework provides "a strong policy in favor of joint custody from which courts should deviate only under the most compelling circumstances." *In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992). To overcome the statutory preference, courts must point to "clear and convincing evidence," guided by the factors in section 598.41(3), "that joint custody is unreasonable and not in the best interest of the child." Iowa Code

---

[2] As an alternative, Shengyi argues that a cash bond should have been imposed in lieu of an outright prohibition on taking the children to China. But he never raised this issue in the district court, nor did he file a motion to amend the decree to request this alternative under Iowa Rule of Civil Procedure 1.904(2). So we cannot consider this argument for the first time on appeal. *See In re Marriage of Gensley*, 777 N.W.2d 705, 718–19 (Iowa Ct. App. 2009).

§ 598.41(2)(b).  As with the visitation restrictions, we review decisions about legal custody de novo.  *Hansen*, 733 N.W.2d at 690.

The district court pointed to several factors that weigh against awarding joint legal custody here—the fourteen-hour time difference and seven-thousand-mile distance between the parents makes communicating or consulting about everyday activities impractical, Shengyi's physical absence limits his knowledge on what is best for the children day-to-day, Shengyi has not actively cared for the children in years, Shengyi once objected to the son getting glasses despite them being recommended by an ophthalmologist, Shengyi unilaterally kept the children in China for months, Shengyi committed an act of domestic violence against Zhenzhen, and Zhenzhen requested sole custody.  *See* Iowa Code § 598.41(3)(a), (c), (d), (g), (h), (j).

On appeal, Shengyi again mainly argues that the district court should have found him more credible than Zhenzhen.  He argues that (1) he never kept his son from receiving glasses and instead only asked for more information before agreeing; (2) he would not prevent the children from leaving China; and (3) no domestic violence occurred, let alone a history of violence.  On the first point, we agree that one minor disagreement on care carries only minimal weight here.  *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998) (explaining "the weight ultimately assigned to each factor depends on the particular facts of each case").  But on the other two points, Shengyi downplays the evidence.  And he glosses over the remaining factors that tipped the scale toward sole legal custody.

Zhenzhen credibly described Shengyi's prior actions preventing her and the children from leaving China. Shengyi's conduct during the China trip was detrimental not just to Zhenzhen, but to his children as well. He abandoned Zhenzhen and the children on the side of the road, leaving them to find their own way home. He confiscated their travel documents and never returned them, forcing the children to remain away from their Iowa home and school far longer than intended. He then never visited them during the six or seven months they were kept in China, instead only calling them. And on those calls, he repeatedly disparaged Zhenzhen as a "criminal" who "kidnapped them" and "will be in jail soon." None of those actions were in the children's best interests.

Shengyi also asks us to override the district court's credibility determinations and find he never abused Zhenzhen. Again, we decline. After hearing testimony from all the witnesses—including Shengyi's mother—the district court found Zhenzhen's testimony credible. Though Shengyi insists the evidence about whether he slapped, strangled, and pushed Zhenzhen is "inconclusive," we see no reason to depart from the district court's informed credibility findings.

True, under our supreme court precedent, a single assault may not necessarily qualify as a "history" of domestic violence sufficient to trigger the rebuttable presumption against joint legal custody. *See* Iowa Code § 598.41(1)(b); *In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997) (explaining a "history" of domestic violence requires weighing "the evidence of domestic abuse, its nature, severity, repetition, and to whom directed," rather than merely conducting a "count of numbers"). But even without the rebuttable presumption, we may still consider prior violence when allocating custody. *See* Iowa Code § 598.41(3)(a)

(considering "[w]hether each parent would be a suitable custodian for the child"), (i) (considering "[w]hether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody").

Weighing all the factors, Shengyi has not actively cared for the children in years. He subordinated their best interests to his own by unilaterally keeping them in China for months and undermined their relationship with Zhenzhen by calling her a criminal. He is geographically distant from the children—literally on the other side of the world—with a time difference that makes day-to-day decision-making challenging. And the children have thrived with Zhenzhen. While any of these factors alone may not be enough to meet the high bar to deviate from joint legal custody, considering them all together, we agree with the district court that sole legal custody is in the children's best interests.

**AFFIRMED.**