2010 Ark. App. 314

**Patricia Pereira Dos Reis COURDIN, Appellant**

v.

**Mitch Paul COURDIN, Appellee.**

No. CA 09–780.

Court of Appeals of Arkansas.

April 14, 2010.

Rehearing Denied June 2, 2010.

Eva Camille Madison, Littler Mendelson, P.C., Fayetteville, AR, for appellant.

Karen Pope Greenaway, White & Greenaway Law Office, Fayetteville, AR, for appellee.

M. MICHAEL KINARD, Judge.

This appeal presents the question of whether the courts of Brazil or the United States should decide a dispute over the custody of a little girl who is a citizen of both countries. The child's mother, appellant Patricia Courdin, is a citizen of Brazil; her father, appellee Mitch Courdin, is a United States citizen who grew up in Springdale, Arkansas. The trial court denied appellant's petition, ruling that the United States had jurisdiction to hear the custody dispute. We affirm that decision.

In 2002, appellee traveled to Brazil, where he met appellant; they were married in January 2003. After appellant obtained a permanent United States residence card, the parties came to the United States in April 2003. They stayed in the Fayetteville area until July 2003, when they returned to Brazil. Appellant became pregnant with their daughter, N.C., after they returned. The child was born in Brazil in May 2004. Appellant's permanent residence card expired in April 2005. In 2007, the parties made plans to return to the United States. |₂With appellant's written authorization, appellee and N.C. traveled to the United States in August 2007, while appellant temporarily stayed behind in Brazil. In November 2007, appellant joined appellee and N.C. in northwest Arkansas. The family stayed in motels for about six months before appellee bought a farm house in Neosho, Missouri. Because the house required renovations, the family lived in a travel trailer on the property. In September 2008, the police were called there for a reason disputed by the parties; the next day, appellee bought appellant a plane ticket to Brazil. On her way there, appellant sought assistance at the Brazilian consulate in Miami.

On January 23, 2009, appellant filed a petition in the Washington County Circuit Court for return of N.C. under the International Child Abduction Remedies Act (ICARA), which implemented the Hague Convention on the Civil Aspects of International Child Abduction. The Hague Convention was adopted to address the problem of inter-country child abduction under international law. Alleging that Missouri was the child's habitual residence, appellee asked that appellant's petition be dismissed and that the matter be transferred to a court in Missouri for an award of temporary custody in his favor.

A hearing on temporary visitation was held by the Washington County Circuit Court in February 2009 and a hearing on the merits was held the next month. Appellee testified that the parties had returned to Brazil in July 2003 for a short stay, with no intention of remaining there; neither party worked. He said that appellant obtained a permanent residence card so they could live in the United States. He stated that, after they discovered she was pregnant, |₃they decided to remain in Brazil for the birth so appellant could be near her mother and grandmother, and they planned to return to the United States when the baby was three weeks old. He said that soon after N.C. was born, appellant became mentally ill, which delayed their leaving Brazil; that it was impossible to travel when she was "insane"; that he was afraid to leave her alone with N.C.; and that, although he tried to persuade her to get medical help (appellant was referred to a neurologist in Brazil) appellant refused. At the temporary hearing, appellee described in great detail appellant's violent behavior, which included self-mutilation, screaming, kicking, and assaulting appellee. He said that she told him she was afraid she would harm the child, and that he had never left them alone together.

Appellee testified that, in 2007, he and appellant decided to move back to the United States with their pet cat; in July, appellant obtained a travel visa and signed an authorization for N.C. to travel abroad with him, and they sold their car and disposed of the belongings that they did not take with them. Appellee stated that he, appellant, and N.C. flew from the town in which they lived to Rio de Janeiro, where appellant remained while he and N.C. continued on to the United States. According to appellee, appellant intended to have plastic surgery in Rio and then join him and N.C. in northwest Arkansas

after two or three months. Appellee testified that appellant flew to the United States in November 2007; for the first six months, the family stayed in motels while looking for property to buy, because appellant would not agree to rent. Appellee said that he bought a farm house, which needed renovations, in Neosho, Missouri, and the family moved into a travel trailer on the property, where he and N.C. still live.[1]

Appellee testified that appellant left on September 30, 2008, after a summer of discord. He said that on one occasion, he called 911 when appellant was hysterical; although an ambulance was sent, he decided not to wait and took her to the hospital in Neosho, with her consent. Appellee stated that later that summer, a neighbor called the police when "Patricia was having one of her episodes"; although the police investigated, they did not arrest him. Appellee said that the next day, he bought appellant a ticket to Brazil. He stated: "My wife just decided to go home to Brazil rather than seek some type of medical treatment."

Appellant testified that she had not intended to stay in the United States in 2003, and that the parties had returned to Brazil because appellee was having problems with his family. She said that appellee suggested that they return to live in the United States, with its educational opportunities, and she "began to agree with him about that." She stated that they agreed that he and N.C. would come first, and he could visit his brother while she spent time with her grandmother. She denied remaining in Brazil for plastic surgery. She added: "I had imagined coming back to Brazil, but I also had imagined that if this life worked out in the United States that I would stay."

Appellant said that immediately upon leaving Brazil, appellee stopped answering most of her calls; when he did answer, he told her that he did not want her to come to the United States and would not give her his address. She stated that she found him by going to Brazil's Ministry of Agriculture and tracing where he had shipped the family cat. She testified that she purchased a round-trip ticket in November 2007 with the intention of bringing N.C. back to Brazil, but appellee refused to let her take the child. Appellant said that she was forced to move to the farm, where she was kept locked up and had no friends. Appellant stated that appellee verbally abused her; kept the telephone locked away; and kept her documents locked in a safe. She said that when she attempted to retrieve them, he hit her on the head with his fist. She said that appellee physically abused her on other occasions; that the police came to their home twice; and that the second occasion was when appellee burned her documents in a barrel.[2] Appellant said that the next day, appellee kicked her out and sent her back to Brazil; on her way there, she sought assistance at the Brazilian consulate in Miami.

Appellant denied intending to abandon her home in Brazil, but acknowledged stating the following at the visitation hearing:

I was living in the United States for eleven months; I was six months legal, and the rest of the time illegal, while we regulized [sic] my documents. I came over on a tourist visa. It was my intent to go ahead and get a green card while I was here. I wanted to get these documents so I could be a legal citizen here

---

1. Appellee also bought another house in Neosho, but the family has not lived there.

2. Appellant's burned passport and Brazilian worker's permit were admitted into evidence.

so I could go to school, so I could do other activities. I said, "Mitch, please help with these documents," but he didn't want to do that. When I came here on a tourist's visa, I intended on staying and getting my education and living in the United States, but I didn't expect him to do all this with me. I was going to stay here with my husband and daughter.

She explained her earlier testimony by stating:

I did not intend to abandon my home in Brazil. It was my intention to return to Brazil. I stayed in the United States so long because of my daughter. I told my husband's attorney at a previous hearing that I wanted to live in the United States and work in the United States and go to school here because when I was in my hotel in Curitiba, I had these conversations with Mitch. He convinced me that it would be a good idea to come to the States to improve my life, to study, that it would be a good situation for me. In these conversations, he was convincing. I changed my mind when he came back to the States, he no longer answered my calls. That's when everything changed.

The court concluded that the parties had abandoned their habitual residence in Brazil and changed it to the United States, and dismissed appellant's petition. Appellant then filed this appeal.

Appellant argues that the trial court's finding of fact that the parties shared a common intention to abandon their home in Brazil and make the United States their new home was clearly erroneous. She asserts that, although she was part of the plan to travel with the parties' daughter to the United States in August 2007, the plan fell apart after her husband's and daughter's arrival in the United States; at that point, she argues, her in-

tentions changed. Appellant also urges us to recognize appellee's purportedly coercive efforts to keep her from leaving the United States as evidence that they did not share a settled intention to abandon Brazil as their habitual residence and make the United States their home.

The Hague Convention, which may be invoked in federal and state courts, seeks to protect children internationally from the harmful effects of their "wrongful removal or retention" caused either by the removal of a child from the state of its "habitual residence" or the refusal to return a child to the state of its "habitual residence." *Barzilay v. Barzilay*, 536 F.3d 844, 846 (8th Cir.2008); *Mozes v. Mozes*, 239 F.3d 1067, 1070–71 (9th Cir. 2001). It is not directed at kidnapping by strangers, but rather at the "unilateral removal or retention of children by parents, guardians, or close family members." *Mozes*, 239 F.3d at 1070. The United States and Brazil are both signatories to the Convention.

The key inquiry is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence. *Barzilay*, 536 F.3d at 847. A retention or removal is wrongful only if it meets the requirements of Article 3 of the Convention:

The removal or the retention of a child is to be considered wrongful where—

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been

so exercised but for the removal or retention.

Hague Convention art. 3, T.I.A.S. No. 11670.

*Barzilay,* 536 F.3d at 847.

When deciding whether a child was wrongfully removed, a court must determine when the removal or retention took place; what the habitual residence of the child was immediately prior to the removal; whether the removal or retention violated the petitioner's custody rights under the law of the habitual residence; and whether the petitioner was exercising those rights at the time of the removal. *See Barzilay,* 536 F.3d at 847. Once it is determined that a child who was habitually residing in a contracting country was wrongfully removed to or retained in another, the Convention requires that the country in which the child is located order the immediate return of the child. *Id.* A case arising from a petition under the Convention is not, however, a custody proceeding. *Id.* The court is to ascertain only whether the removal or retention of a child was wrongful under the law of the child's habitual residence, and if so, to order the child's return to his or her place of habitual residence for the court there to decide the merits of the custody dispute. *Id.* The authorities of the contracting country responsible for child custody determinations shall not decide custody rights until it has been determined whether the child is to be returned under the Convention. *Id.*

"Habitual residence," which is not defined in the language of the Convention or by ICARA, *Silverman v. Silverman,* 338 F.3d 886, 888 (8th Cir.2003), is used in determining the country having a presumed paramount interest in the child. *Black's Law Dictionary* 1335 (8th ed.2004). A person may have only one "habitual residence," and it should not be confused with domicile. *Silverman,* 338 F.3d at 898. While a determination of "habitual residence" under the Convention is primarily factual, it is not left entirely within the "unreviewed" discretion of the trial court. *Mozes,* 239 F.3d at 1073. The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. *Id.* at 1075. Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which the appellate court defers to the trial court. *Id.* at 1075–76. The reviewing court accepts the trial court's historical or narrative facts unless they are clearly erroneous, but exercises de novo review of the trial court's application of legal principles to the facts. *Silverman,* 338 F.3d at 896. The determination of a child's habitual residence presents mixed questions of law and fact and requires the analysis of many factors, including the settled purpose of the move to the new country from the child's perspective; parental intent regarding the move; the change in geography; the passage of time; the parents' sale and purchase of residences; and the acclimatization of the child to the new country, such as enrolling in school and bringing personal possessions or pets. *Barzilay,* 536 F.3d at 851; *Silverman,* 338 F.3d at 898; *Mozes,* 239 F.3d at 1071–81. Other relevant factors are the location of the family's economic base; the location of relatives; the parents' citizenship and immigration status; and the type of visa with which they entered the country (temporary or permanent residence). *Mozes,* 239 F.3d at 1082. When the country in which it has been agreed that the child should spend time is the native country of a parent,

> [i]t is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior resi-

dence. A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality. *Id.*

As the court noted in *Mozes*, when the parents no longer agree on where the child's habitual residence has been fixed, difficulty arises:

> In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is. The factual circumstances in which this question arises are diverse, but we can divide the cases into three broad categories.
>
> On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. Most commonly, this occurs when both parents and the child translocate together under circumstances suggesting that they intend to make their home in the new country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose.
>
> On the other side are cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period. In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence.
>
> In between are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred. Clearly, this is one of those questions of "historical and narrative facts" in which the findings of the district court are entitled to great deference. *Feder [v. Evans–Feder]*, 63 F.3d [217] at 222, n. 9 [ (3d Cir.1995) ].

239 F.3d at 1076–78.

"While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone"; there must be an actual geographical change for a sufficient period for acclimatization to occur. *Mozes*, 239 F.3d at 1078–79. "When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long." *Id.* at 1078. Even a lengthy period may not suffice, however, when circumstances hinder acclimatization. *Id.* In the absence of settled parental intent, courts should be slow to infer from the child's contacts in the new country that an earlier habitual residence has been abandoned. *Id.* at 1079. "The function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo

with regard to the primary locus of the child's life." *Id.*

Where children already have a well-established habitual residence, simple consent to their presence in another forum is not usually enough to shift it there. *Mozes,* 239 F.3d at 1081. The agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration. *Id.* However, "one spouse['s] harboring reluctance during a move does not eliminate the settled purpose from the children's perspective." *Silverman,* 338 F.3d at 899.

Courts have held that acclimatization has not occurred or that the parents did not form a shared intent to establish a habitual residence in the new country when a spouse subjected the other to verbal, emotional, and physical abuse, or when the husband's family was hostile to the wife, and the wife and children were linguistically and socially isolated. *Mozes,* 239 F.3d at 1078, n. 31. In *Silverman,* 338 F.3d at 900, the court acknowledged that "habitual residence" is not established when the removing spouse is coerced involuntarily to move to or remain in another country. The court cautioned, however, that this is not so when there was no coercion or abuse prior to the move or immediately thereafter: "Her subsequent, post-move desire to return to the United States, and the finding by the district court that she was subjected to coercion and abuse beginning two months after her arrival, does not change the legal conclusion that the habitual residence of the children changed from Minnesota to Israel." *Id.* The same thing can be said of appellant's change of mind about moving from Brazil to the United States.

This case was not simple. There was evidence that appellant suffered from serious mental problems and engaged in violent behavior; that appellee was violent and controlling; that appellee may have tricked appellant into letting him take the child to the United States while appellant remained in Brazil; and that appellee was simply trying to take care of his child while dealing with a mentally ill wife. However, whether the parties shared a settled intention to establish a habitual residence in the United States was a question of fact for the trial court, which assessed their credibility at two hearings. In light of the evidence about the steps the parties took to translocate to the United States in 2007, and appellant's admissions about her initial intentions concerning the move at the preliminary hearing, we cannot say that the trial court's finding on this issue was clearly erroneous.

As stated previously in this opinion, the Washington County Circuit Court did not acquire jurisdiction to decide the issue of custody through the petition appellant filed under the ICARA. That jurisdiction had already been established in the Missouri court where the custody matter was pending. Appellant's petition in the Washington County Circuit Court merely tested the issue of whether, under the Hague Convention, the United States or Brazilian courts could proceed to the merits of the pending Missouri custody case. In affirming the trial court, we hold that it did not err in determining that the Missouri court could proceed in determining custody.

Affirmed.

GLADWIN and GLOVER, JJ., agree.