*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRANDY MOORE, | ) | |
| | ) | Supreme Court No. S-15712 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-06985 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JEREMY MOORE, | ) | |
| | ) | No. 7013 – May 29, 2015 |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Laurence Blakely, Mendel & Associates, Inc., Anchorage, for Appellant. Notice of nonparticipation filed by Cameron Compton, Law Offices of Dan Allan & Associates, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I.    INTRODUCTION

Brandy and Jeremy Moore have one child, a ten-year-old daughter. When Brandy and Jeremy divorced in 2014, the superior court granted sole legal and primary physical custody of the child to Brandy and awarded Jeremy unrestricted visitation, including visitation to foreign countries. Jeremy proposed taking the child to Micronesia during his visitation period because he is now in a relationship with a Micronesian

woman he met while he was stationed there with the Army. Brandy asked the superior court to limit Jeremy's international visitation to countries that have ratified the Hague Convention on the Civil Aspects of International Child Abduction. The superior court denied Brandy's motion, and she now appeals, arguing that the superior court abused its discretion by allowing unrestricted international visitation. She worries that if Jeremy absconds with the child to a non-signatory country, the child will then be beyond the jurisdiction of the Alaska court to enforce the custody order. But because the superior court made an express finding that Jeremy's conduct raised no concerns about the safety and return of the child, we affirm. Although the Hague Convention is one factor that courts can look to in determining whether international visitation is appropriate when there are concerns about the safety and return of a child, it is simply one factor among many and is not dispositive.

## II. FACTS AND PROCEEDINGS

### A. Facts

Brandy and Jeremy married in 2003 and have one daughter, born in 2004. Jeremy was in the military while the parties were married and was deployed to Iraq in 2004, Afghanistan in 2007-08, and Micronesia in 2012-13. In 2014 Jeremy was told that he was being involuntarily separated from the Army following an investigation in which the Army found Jeremy guilty of having an inappropriate relationship in Micronesia with a woman who was not his wife.

The parties separated in May 2013 and divorced in July 2014. Brandy alleges that since their separation, Jeremy has exercised only limited visitation with the child. She reports that he had seven visits with the child from the time of the parties' separation until their divorce trial over a year later, only three of which were overnight. She alleged at trial that in the past Jeremy has gone up to two months without requesting visitation. Brandy has been the primary caregiver since their daughter was born.

**B.	Proceedings**

A trial was held in part to determine Jeremy's visitation rights. The parties agreed that Brandy would have sole legal custody and primary physical custody, and that Jeremy would have reasonable visitation including part of summer break.[1] Brandy requested a graduated summer visitation schedule, with Jeremy progressing to have visitation for most of the child's summer break by 2016. Jeremy requested that during his custodial time with the child he have "the option to take the child out of the country," in particular to Micronesia.

Brandy testified that she did not want the child to travel to Micronesia with Jeremy because she thought she would have no legal recourse if Jeremy attempted to keep their child there, citing the fact that Micronesia is not a signatory to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention). The Hague Convention is a multilateral treaty that "provides for a civil remedy to return a child to his or her 'habitual residence' after unlawful abduction or wrongful retention in a foreign nation."[2] Brandy testified that she was hesitant to let their daughter travel abroad with Jeremy but that she would permit the child to visit foreign countries that had ratified the Hague Convention. Brandy asserted that legal protection under the Hague Convention was necessary because Jeremy had a demonstrated disregard for the law based on his Army infractions.

---

[1]	Jeremy testified that he intended to find work in the construction industry, which would require him to move every six to nine months. He acknowledged that, as a result, Brandy would be better able to provide the child with stability.

[2]	*Abouzahr v. Matera-Abouzahr*, 824 A.2d 268, 279 (N.J. Super. App. Div. 2003); *see* 22 U.S.C. §§ 9001-9141 (2012) (establishing procedures for implementing the Hague Convention in the United States).

Jeremy countered that Brandy's claims regarding the Hague Convention were pretext for the fact that she did not want him to take their daughter out of the country because she was resentful of his relationship with a Micronesian woman. He argued that Brandy "impermissibly influenced" the child by convincing her that he left because he "chose [the woman] over the child." Jeremy also asserted that Brandy was harassing him and refusing to facilitate and encourage his relationship with the child, and that Brandy's "behavior and mental state have deteriorated." He alleged that Brandy was stalking him by driving by his residence and forcing her way into his house; contacting his Army chain of command and making false claims against him; and yelling, threatening, and throwing items at Jeremy in front of the child. Jeremy argued that he had sparse contact with the child because he was "scared of Brandy" and was worried that Brandy would again levy false claims against him with his Army chain of command.

At the time of trial Jeremy was awaiting his discharge from the Army and looking for civilian work both in the United States and abroad. He argued that he wanted their daughter to be able to visit him wherever he resides and that it is in her best interest "to be able to visit different cultures."

Superior Court Judge Gregory Miller issued a decision in July 2014 granting Brandy sole legal custody and primary physical custody. The superior court ordered that "[t]here shall be no restriction on where Jeremy may travel with the child during his visitation with the child. Jeremy may travel out of the country including, but not limited to Micronesia. There is no restriction that Jeremy may not travel with the child to only Hague Convention countries." The superior court granted visitation to Jeremy for parts of the summer of 2014 and every other weekend if he remained in Alaska during the school year. The court granted Jeremy summer visitation for five full weeks beginning in 2015 and continuing every summer thereafter. It also awarded visitation during winter break in odd numbered years and spring break in even numbered

years.  At the end of the decision, under the heading "Findings of Fact and Conclusions of Law," the superior court noted that "[t]he child custody and visitation is in the best interest of the child."

Earlier, at the end of the trial in June, the superior court had provided more detail about its decision.  The court discussed each of the statutory best interest factors as they relate to custody and visitation in this case.[3]  It then rejected Brandy's request to limit foreign travel.  The court acknowledged Brandy's desire to avoid "plac[ing the child] in any situation where [Jeremy] might take her and keep her and not return her," but concluded that it had "seen no evidence" and "heard no testimony that [Jeremy] has that intention or desire."  The superior court said that an example of that intention or desire might be present if Jeremy "had a job offer in Micronesia, if he proposed to the person in Micronesia and they were planning to live over there," or if similar circumstances existed, but that it saw none of that here.  The superior court noted that travel is broadening and enriching for children and stated, "I don't care if it's a Hague Convention country or not. [Travel] is a good thing, in my mind.  There are exceptions to that, of course.  But in general terms, that's what I'm finding."

Brandy filed a motion for reconsideration at the end of July 2014.  She argued that the superior court "failed to consider [her] arguments regarding the significance of the Hague Convention and the prevention of parental child abductions when it expressly granted Jeremy the power to travel to a non-Hague country with the minor child."  Brandy reiterated her concern that "[i]f Jeremy travels to Micronesia, as he wishes, the child is beyond the jurisdiction of this Court and the United States to enforce a child custody order" and argued that "[s]hould Jeremy decide to not return [the child], this Court has provided him with the means to do so."  Finally, Brandy asserted

---

[3]      *See* AS 25.24.150(c).

that the superior court's order "has overlooked the material fact that Jeremy's grant of unfettered travel to non-Hague Convention countries with [the child] does not comport with the letter and the spirit of Alaska's child custody laws."

Jeremy opposed the motion for reconsideration regarding international travel and again argued that Brandy was using the fact that Micronesia is not a Hague Convention signatory "as pretext to prohibit visitation where the 'other woman' lives."

The superior court issued a short order in September 2014 denying Brandy's motion for reconsideration "as to travel restrictions." Brandy appeals, arguing that the trial court's award of unrestricted international travel was an abuse of discretion, asserting that "trial courts must consider, inter alia, a foreign country's Hague Convention signatory status in determining whether it is in the best interest of the child to allow [foreign] visitation" and that "unrestricted international travel is not in [the child's] best interest," in particular. She requests that this court "reverse the trial court's decision on the subject of international travel and remand with directions to issue an order allowing visitation to occur in Hague Convention signatories only and require the posting of security prior to travel." Jeremy did not submit a brief on appeal.

## III.   STANDARD OF REVIEW

"The superior court has broad discretion in its determinations of child custody. We will not set aside the superior court's child custody determination unless its factual findings are clearly erroneous or it abused its discretion."[4] A factual finding is "clearly erroneous when our review of the entire record leaves us 'with a definite and firm conviction that a mistake has been made.' "[5] "The trial court's factual findings

---

[4]   *Limeres v. Limeres*, 320 P.3d 291, 295-96 (Alaska 2014) (footnote omitted) (citing *Cusack v. Cusack*, 202 P.3d 1156, 1158 (Alaska 2009)).

[5]   *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008) (quoting *Dingeman*
(continued...)

enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[6] There is an abuse of discretion if the superior court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[7] This court will not overturn a trial court's discretionary ruling unless "the reasons for the exercise of discretion are clearly untenable or unreasonable."[8]

## IV. DISCUSSION

In determining whether to limit foreign visitation, the trial court may look to a number of factors, including whether proposed countries of visitation are Hague Convention signatories. But this factor is not dispositive given the broad discretion accorded to trial courts in custody determinations. Because the superior court considered the risks of and reasons for international visitation here and found that they posed no threat to the safety and return of the child, we find no abuse of discretion.

---

[5](...continued)
*v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)).

[6] *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

[7] *Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

[8] *Burke v. Maka*, 296 P.3d 976, 980 (Alaska 2013) (quoting *Lewis v. State*, 469 P.2d 689, 695 (Alaska 1970)).

**A.      Trial Courts May Look To A Number Of Factors, None Of Which Are Dispositive, In Determining Whether To Limit International Visitation.**

Alaska Statute 25.24.150(c) requires courts to "determine custody in accordance with the best interests of the child under AS 25.20.060-25.20.130." The statute sets out nine enumerated factors for trial courts to consider when making a discretionary best interest determination toward apportioning custody.[9]  Although Brandy does not seek review of "an 'award' or 'determination' of custody as used in the Alaska Statutes, and therefore the explicit statutory best interests factors contained in

---

[9]      The factors that AS 25.24.150(c) requires courts to consider when making a custody determination in the best interest of a child include:

> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, . . . ;
>
> . . . .
>
> (9) other factors that the court considers pertinent.

The statute also discusses evidence of domestic violence and substance abuse (factors (7) and (8), respectively), which were not a focus at trial here.

AS 25.24.150(c) do not apply,"[10] we have recognized that the superior court is "nonetheless required to account for [the child's] best interests" when considering issues regarding the permissibility of international travel and visitation.[11]

Brandy argues that the superior court abused its discretion by allowing unrestricted international visitation because the proposed country of travel, Micronesia, is not a signatory to the Hague Convention.[12] A trial court abuses its discretion if, among other things, it "consider[s] improper factors in making its custody determination" or "fail[s] to consider statutorily mandated factors."[13] Alaska law does not explicitly prohibit child custody visitation in non-Hague Convention signatory nations or otherwise restrict international travel as part of custody visitation, and there are no specific statutorily mandated factors for a trial court to consider with regard to foreign visitation.

---

[10] *Patrawke v. Liebes*, 285 P.3d 268, 271 (Alaska 2012) (citation omitted).

[11] *See id.* at 271-72 (holding it was an abuse of discretion for the superior court to deny a father's request to secure a passport for his child without any contrary reason).

[12] There are 93 Hague Convention signatory countries out of 195 countries worldwide. *Status table*, HAGUE CONFERENCE ON PRIVATE INT'L LAW, http://www.hcch.net/index_en.php?act=conventions.status&cid=24 (last visited May 22, 2015). AS 25.30.400 provides that "a court of this state may enforce an order for the return of a child made under the Hague Convention on the Civil Aspects of International Child Abduction as if the order were a child custody determination." Many parents have filed suit under the International Child Abduction Remedies Act, the U.S. law implementing the Hague Convention, *see* 22 U.S.C. § 9001 *et seq.* (2012), to have a child returned after the other parent took and kept a child outside his or her country of habitual residence. *See, e.g.*, *Abbot v. Abbot*, 560 U.S. 1 (2010); *Karpenko v. Leendertz*, 619 F.3d 259 (3d Cir. 2010); *Toren v. Toren*, 191 F.3d 23 (1st Cir. 1999); *Shalit v. Coppe*, 182 F.3d 1124 (9th Cir. 1999); *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996); *Courdin v. Courdin*, 375 S.W.3d 657 (Ark. App. 2010).

[13] *Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

Brandy does not cite any decision from this court or any other that has held that a country's Hague Convention signatory status provides a definitive ground for determining whether to allow international visitation in the best interest of the child. Indeed, courts in other jurisdictions have declined to apply a bright-line rule to limit foreign visitation based on the Hague Convention signatory status of a proposed country of travel.[14] A bright-line rule restricting international visitation to Hague Convention signatory nations would "mistakenly change the focus from the parent to whether [the proposed country of travel's] laws, policies, religion or values conflict with our own."[15]

Other courts that have considered international visitation issues broadly, and the Hague Convention specifically, have generally done so in light of the traveling parent's risk of and assurances against non-return of the child, and the reason for the child's travel, such as family ties, heritage, cultural programming, or similar reasons.[16]

---

[14] *See, e.g.*, *In re Rix*, 20 A.3d 326, 329 (N.H. 2011) ("[W]hile a foreign country's Hague Convention signatory status should be a significant factor for the trial court to consider, it cannot, standing alone, be determinative of whether it is in the best interests of a child to travel with a parent outside the country."); *MacKinnon v. MacKinnon*, 922 A.2d 1252, 1260 (N.J. 2007) ("Although a foreign nation's Hague Convention status is a pertinent factor [in considering the international removal of a child], it is by no means dispositive."); *Abouzahr v. Matera-Abouzahr*, 824 A.2d 268, 281 (N.J. Super. App. Div. 2003) (declining "to adopt a bright-line rule prohibiting out-of-country visitation by a parent whose country has not adopted the Hague Convention"); *Long v. Ardestani*, 624 N.W.2d 405, 417 (Wis. App. 2001) (observing that no cases "even hint" at a rule that provides "as a matter of law that a parent . . . may not take a child to a country that is not a signatory to the Hague Convention if the other parent objects").

[15] *Abouzahr*, 824 A.2d at 281-82.

[16] *See, e.g.*, *MacKinnon*, 922 A.2d at 1259-60 (addressing "concerns implicated by international removal, such as Hague Convention membership, cultural and social concerns, feasibility of visitation, and enforceability of parental rights").

In *Abouzahr v. Matera-Abouzahr*, the New Jersey Superior Court, Appellate Division, articulated a sensible standard for considering a country's Hague Convention signatory status in conjunction with other factors:

> The danger of retention of a child in a country where prospects of retrieving the child and extraditing the wrongful parent are difficult, if not impossible, is a major factor for a court to weigh in ruling upon an application to permit or to restrain out-of-country visitation. But it is not the only factor. In addition to the laws, practices and policies of the foreign nation, a court may consider, among other things, the domicile and roots of the parent seeking such visitation, the reason for the visit, the safety and security of the child, the age and attitude of the child to the visit, the relationship between the parents, the propriety and practicality of a bond or other security and the character and integrity of the parent seeking out-of-country visitation as gleaned from past comments and conduct.[17]

Courts often examine the risk that a traveling parent might take a child outside the United States and not return the child.[18] "[A] number of cases in American

---

[17]    824 A.2d 268, 282 (N.J. Super. App. Div. 2003).

[18]    *See, e.g.*, *Kamal v. Imroz*, 759 N.W.2d 914, 919 (Neb. 2009) (holding that a trial court did not abuse its discretion in restricting a child's travel out of the country because father once took the child out of state without informing the mother); *Rix*, 20 A.3d at 329-30 (holding that a trial court did not abuse its discretion by permitting a father to vacation with his child in India, a non-Hague Convention country, when the mother's evidence gave no indication the father intended to flee with the child and not return); *Puran v. Murray*, 829 N.Y.S.2d 227, 228 (N.Y. App. Div. 2007) (holding that a family court providently exercised discretion to permit a father to take his child to his home country of Guyana when the mother offered no proof that the father threatened to abscond with the child).

jurisdictions recognize the propriety of [limiting] visitation when the noncustodial parent is shown to pose a risk of abduction."[19]

Courts also examine whether there are available legal structures that may provide assurances against non-return, such as general extradition treaties or having the traveling parent post a security bond. Some courts have required a traveling parent to post a security bond prior to travel,[20] but doing so is discretionary based on the parents' circumstances.[21] In *Patrawke v. Liebes*, we did not require a father to post a security bond in order for him to obtain a passport to travel with his child.[22] The mother "failed to offer a compelling reason why it would not be in [the child's] best interests to obtain a passport."[23]

---

[19] *Lee v. Lee*, 49 So.3d 211, 215 (Ala. Civ. App. 2010) (citing *Shady v. Shady*, 858 N.E.2d 128, 143 (Ind. App. 2006); *Moon v. Moon*, 589 S.E.2d 76, 79-80 (Ga. 2003)); *see also Monette v. Hoff*, 958 P.2d 434, 436 (Alaska 1998) (limiting visitation in part based on the guardian ad litem's testimony that "[the mother's] history of secreting away her daughter from [the daughter's father], as well as her conduct of not telling [the father] exactly where the child was here in Alaska for a period of time does cause concern that she presents a risk of abduction of the child").

[20] *See, e.g., Long v. Ardestani*, 624 N.W.2d 405, 411 (Wis. App. 2001) (imposing a bond through a pre-existing custody agreement).

[21] *See Abouzahr*, 824 A.2d at 282 (mentioning "the propriety and practicality of a bond or other security" as a factor "a court may consider, among other things" but declining to impose restraints on international visitation because "[n]o testimony indicates that [the father] disrespects the United States, its culture, customs, laws or values").

[22] 285 P.3d 268 (Alaska 2012).

[23] *Id.* at 272.

Extradition treaties can also provide assurances against non-return. Micronesia, the proposed country of foreign visitation, does have an extradition treaty with the United States.[24] That extradition treaty could be used to enforce the International Parental Kidnaping Crime Act (IPKCA), which Congress passed in 1993 to supplement the Hague Convention when its civil remedies are inapplicable or ineffective.[25] IPKCA makes it a federal offense for a parent to wrongfully remove a child from the United States, punishable by up to three years imprisonment.[26] Thus, Brandy would not be without recourse, particularly since Jeremy offered to sign a document consenting to the application of the laws of the United States during out-of-country travel.[27]

---

[24] Agreement on Extradition, Mutual Assistance in Law Enforcement Matters and Penal Sanctions Concluded Pursuant to Section 175 of The Amended Compact of Free Association, U.S.-Micr., tit. 2, art. 1, May 14, 2003, T.I.A.S. 04-625.4.

[25] *See* Pub. L. 103-173 § 2(a), 107 Stat. 1998 (codified as amended at 18 U.S.C. § 1204 (2012)); *Abouzahr*, 824 A.2d at 280 (discussing IPKCA).

[26] 18 U.S.C. § 1204(a); *see also United States v. Amer*, 110 F.3d 873, 877-79 (2d Cir. 1997) (upholding IPKCA against a constitutional challenge).

[27] Like a country's Hague Convention signatory status, whether a proposed country of travel has an extradition treaty with the United States is not dispositive in deciding whether to limit foreign visitation. *See MacKinnon v. MacKinnon*, 922 A.2d 1252, 1262 (N.J. 2007) (holding only that "trial courts must *consider* the question of the enforceability of visitation and other court orders in the international removal context" (emphasis added)); *Abouzahr* 824 A.2d at 281 (declining to adopt a "bright-line rule prohibiting out-of-country visitation by a parent whose country has not . . . executed an extradition treaty with the United States"). The *MacKinnon* court sensibly held that "[i]n future proceedings, when a parent raises concerns regarding enforceability, the trial court should pursue alternative solutions to such problems by, for example, encouraging the parties to obtain appropriate orders in the foreign nations or enter into contractual agreements, enforceable overseas, governing visitation arrangements." 922 A.2d

(continued...)

*Abouzahr* also advises courts to look to "the reason for the visit."[28] Brandy asserts that "[c]ourts generally find that international travel to a non-signatory is [only] in the child's best interest if there is a particular reason for this travel, for instance, when relatives live abroad, when one parent is from the foreign country, or when the travel is sanctioned by a school language program in which the child is enrolled." Although it is true that the cases Brandy cites[29] articulate some positive reason for travel, they do not imply that the lack of any particularized justification beyond the broadly enriching benefits of travel should act as a negative restriction.

The superior court did not specifically analyze the reasons for the child's travel, save to say that travel is generally beneficial.[30] Brandy may not agree with the broad benefits of travel, but the fact that the superior court did not enumerate any particularized travel justifications does not mean it "failed to consider statutorily

---

[27](...continued) at 1260.

[28]     824 A.2d at 282.

[29]     *See Patrawke v. Liebes*, 285 P.3d 268, 270 (Alaska 2012) (allowing a father to obtain a passport for his child despite the mother's objection so the child could, among other things, attend a Japanese Immersion Program through her school); *In re Rix*, 20 A.3d 326, 329 (N.H. 2011) (allowing visitation to India, a non-signatory country, to see relatives); *Long v. Ardestani*, 624 N.W.2d 405, 416 (Wis. App. 2001) (allowing visitation to Iran, a non-signatory country, because, among other reasons, the father was from Iran).

[30]     The superior court noted at the end of trial that travel is broadening and enriching and stated, "I don't care if it's a Hague Convention country or not. [Travel] is a good thing, in my mind. There are exceptions to that, of course. But in general terms, that's what I'm finding."

mandated factors"[31] or otherwise abused its discretion. As we have previously suggested, travel is generally beneficial and in a child's best interests.[32]

**B.    The Superior Court Did Not Abuse Its Discretion By Not Limiting International Visitation Because It Found That Jeremy Posed No Threat To The Child's Safety And Return.**

We have held that "[p]rovisions of a custody award must be supported by findings of fact demonstrating that the superior court properly considered the best interests of the child."[33] "The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[34] Here, the superior court stated that it had "seen no evidence" and "heard no testimony that [Jeremy] has [the] intention or desire" to "take [the child] and keep her and not return her." Brandy presented no conflicting evidence to suggest that Jeremy poses a flight risk with the child; she merely asserted that he may wish to travel abroad for work or to see his Micronesian girlfriend. But those possibilities do not indicate any intent on Jeremy's

---

[31]    *Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

[32]    *See Patrawke*, 285 P.3d at 272 (suggesting that travel is beneficial by holding that because a child "has significant opportunities to travel abroad, . . . to deny her a passport, without any contrary reason given by [the mother], assuredly would harm [the child's] best interests").

[33]    *Green v. Parks*, 338 P.3d 312, 315 (Alaska 2014) (alteration in original) (quoting *Mariscal v. Watkins*, 914 P.2d 219, 222 (Alaska 1996)).

[34]    *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)); *see also Hanlon v. Hanlon*, 871 P.2d 229, 232 (Alaska 1994) ("[A]ssessing witness credibility is a trial-court function, and the court in this case clearly acted within its discretion by crediting one version of events over another.").

part to take and keep the child abroad in contravention of the custody order and thus the superior court's factual findings are not clearly erroneous. We do not "reweigh the evidence when the record provides clear support for the trial court's ruling."[35]

We next turn to whether the superior court abused its discretion by not limiting foreign visitation. The abuse of discretion standard asks "whether the reasons for the exercise of discretion are clearly untenable or unreasonable"[36] and fall outside the boundaries of reasonable responses. Here, the superior court acknowledged and weighed the risks that Jeremy's foreign travel with the child might entail, and thus its visitation order is not facially unreasonable.

In particular, Brandy's subjective fear that Jeremy might abscond with the child is not, standing alone, enough to suggest that the superior court's order not limiting foreign visitation was unreasonable or otherwise an abuse of discretion. Other courts that have considered whether one parent's fear that the other poses a flight risk should factor into a trial court's custody determination have concluded that such fears should not be credited unless they are well-founded.[37] The *Abouzahr* court held that even if one parent's fear of non-return is genuine, "fear alone is not enough to deprive a non-custodial parent" of international visitation where "[n]o testimony indicates that [the

---

**35** *Graham R. v. Jane S.*, 334 P.3d 688, 696 (Alaska 2014) (quoting *Kelly v. Joseph*, 46 P.3d 1014, 1019 (Alaska 2002)).

**36** *Burke v. Maka*, 296 P.3d 976, 980 (Alaska 2013) (quoting *Lewis v. State*, 469 P.2d 689, 695 (Alaska 1970)).

**37** *See, e.g.*, *Keita v. Keita*, 823 N.W.2d 726, 732 (N.D. 2012); *MacKinnon v. MacKinnon*, 922 A.2d 1252, 1256 (N.J. 2007); *Abouzahr v. Matera-Abouzahr*, 824 A.2d 268, 281 (N.J. Super. App. Div. 2003).

parent] disrespects the United States, its culture, customs, laws or values."[38] In *Keita v. Keita*, the North Dakota Supreme Court held that a district court's finding that a father was a "flight risk" was clearly erroneous because the record did not "include specific evidence that [the father] has an intent to abscond or flee with the child."[39] Similarly, in *MacKinnon v. MacKinnon*, the New Jersey Supreme Court upheld a trial court's removal order to Japan based in part on the trial court's finding that the mother's past conduct provided "no justifiable basis for a genuine fear that [she] will not return [the child] or refuse visitation."[40] "Observing that [the mother] obeyed all previous court orders, the [trial] court considered the possibility that [the mother] would abscond with [the child] 'an acceptable risk under the circumstances,' " which the New Jersey Supreme Court held did not constitute an abuse of discretion.[41]

Here, Brandy attempts to substantiate her fear that Jeremy may abscond with the child by arguing that Jeremy "has no demonstrated incentive to return to the United States" because he has no job or strong ties here and that he "has also demonstrated a disdain for legal rules," based on his Army infractions. Though the Army found Jeremy guilty of having an inappropriate relationship in Micronesia with a woman who was not his wife, this prior bad act has little bearing on Jeremy's propensity

---

[38] *Abouzahr*, 824 A.2d at 281, 282.

[39] 823 N.W.2d 726, 732 (N.D. 2012) (noting that the trial court's factual finding was clearly erroneous because it "appear[ed] to be based on 'uncertainty' about [the father's] immigration status and extended family, in addition to [the mother's fears]").

[40] 922 A.2d 1252, 1256, 1262 (N.J. 2007) (noting that although the trial court found the father's fear to be "sincere," it ultimately concluded that his fear that he would lose his daughter was "unfounded").

[41] *Id.* at 1256.

to disregard the law with regard to the child's custody. His relationship with a woman in Micronesia might provide an incentive for him to go there, perhaps long-term, but it does not suggest that Jeremy might want to abscond with the child and keep her in Micronesia permanently.

Finally, the superior court did not abuse its discretion by "fail[ing] to consider statutorily mandated factors"[42] regarding foreign visitation because there is no Alaska law that addresses international visitation. And the superior court did not "assign[] disproportionate weight to particular factors while ignoring others"[43] because there are no past Alaska decisions to inform the weight that trial courts should give to "other factors the court considers pertinent"[44] regarding whether foreign visitation is in a child's best interest. The superior court's on-the-record discussion with the parties at the end of the trial demonstrates that it considered the key factors underlying the importance of the Hague Convention and other courts' reasoning as to whether to allow international visitation: the risks of and reasons for that travel. Thus, the superior court did not "consider[] improper factors in making its custody determination."[45]

## V. CONCLUSION

Because the superior court found that Jeremy's conduct raised no concerns about the safety and return of the child, a finding which is not clearly erroneous, we AFFIRM, and hold that the superior court did not abuse its discretion by not limiting international visitation to Hague Convention signatory nations.

---

[42] *Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

[43] *Id.* (quoting *Siekawitch*, 956 P.2d at 449).

[44] AS 25.24.150(c)(9).

[45] *Frackman*, 327 P.3d at 882 (quoting *Siekawitch*, 956 P.2d at 449).