NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JENNIFER KELLY, | ) |
| | ) Supreme Court No. S-18227 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-20-06178 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| JOSEPH KELLY, | ) AND JUDGMENT[*] |
| Appellee. | ) |
| | ) No. 1946 – February 8, 2023 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Jennifer Kelly, pro se, DuPont, WA, Appellant. D. Patrick Phillip, Carlson Law Group, LLC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

A woman challenges a custody order granting her ex-husband sole legal custody and primary physical custody of their three children. She challenges the sufficiency of the evidence supporting the superior court's factual findings that she was abusive but did not suffer abuse herself, that she manipulated her children, and that her ex-husband is a suitable caretaker. We affirm the custody order because the superior court did not make or rely on findings of physical abuse and because the superior court's

---

[*] Entered under Alaska Appellate Rule 214.

other findings are supported by the record.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jennifer and Joseph Kelly married in March 2014. Joseph adopted Jennifer's daughter from a previous relationship, and the couple had two children together. They separated in early April 2020, and Joseph filed for divorce the next month. Jennifer then filed a petition for a domestic violence protection order (DVPO) on behalf of herself and the children against Joseph. The superior court denied the petition in June and found that their eldest daughter had apparently been coached by Jennifer to testify against Joseph.

Immediately following the denial, military authorities were notified that Jennifer had indicated to a treatment provider that she planned to set fire to the family home. When law enforcement officers responded, they found gas cans in the living room.

Jennifer then took the children to Washington without informing Joseph, in violation of a court order prohibiting either parent from removing "any child who is the subject of this case from Alaska." Jennifer was arrested for custodial interference; her criminal case was pending at the time of the custody hearing. Joseph was granted interim custody of the children and had been caring for them for over a year at the time of the custody hearing.

### B. Proceedings

The court held a custody hearing over two days in August and September 2021. Both parties alleged they were victims of domestic violence and offered conflicting accounts of alleged instances of physical altercations. Each of them also testified about mental health struggles. Joseph testified that he had been hospitalized for suicidal ideation but that with treatment he felt an "almost 100 percent turn around" in

his mental health. Jennifer testified that she suffered from post traumatic stress disorder.

Joseph testified that when he first was awarded custody, the children thought he was going to kill them. He stated he took 30 days of leave to spend time with the children and that he arranged counseling for all three of the children to help them adjust to living with him and without Jennifer. Joseph testified that he had a strong support network for the children and that they had established a stable routine with him. He testified that he wanted the "girls to be able to speak to their mother," but that Jennifer often had not responded to his attempts to make contact. He stated that he arranged weekly contact with Jennifer's parents and would welcome them to visit. Joseph testified that he had no doubt Jennifer loved the children, but that he was concerned she would take them again or coach them to hate him if she were awarded custody.

Jennifer testified that she did not respond to Joseph's attempts to set up contact with the girls, because she believed that Joseph's mother had mocked her during a video chat, and because she was seeking an order to enforce the interim custody order which required that supervised visits be conducted "by an independent third party." Jennifer refused to provide any information in open court about her current address, phone number, or her fiancé. She testified that if Joseph were awarded custody, she would prefer to communicate with him through a third party.

The court found Joseph was credible, although "guarded" in his responses. It found Jennifer was not credible because she constantly "fenced" with Joseph's attorney, provided contradictory testimony, and was unable or unwilling to answer simple questions. The court then made findings on each of the best interests factors in AS 25.24.150(c). The superior court found that four of the factors did not favor either

parent: the children did not have unique needs;[1] they were too young to factor in their preferences;[2] there was an equal amount of love and affection between the children and each parent;[3] and there was no evidence of substance abuse by either parent.[4]

But the court found that other factors favored Joseph. It found that Jennifer's conduct throughout the divorce process had been detrimental to their eldest daughter's emotional health.[5] The court found Jennifer could not offer the children the same stability as Joseph, and cited her refusal to reveal information about her fiancé and her current and future living situations.[6] It also found that, rather than fostering a relationship with Joseph, there was "no question but that [Jennifer] would do everything she could to cut [him] as far out of the picture as possible" as she had done in the past.[7]

---

[1] *See* AS 25.24.150(c)(1) (requiring court to consider children's particular "physical, emotional, mental, religious, and social needs" in custody award).

[2] *See* AS 25.24.150(c)(3) (requiring court to consider children's custody preferences if they are of sufficient age and capacity to form them).

[3] *See* AS 25.24.150(c)(4) (requiring court to consider "love and affection" existing between children and each parent).

[4] *See* AS 25.24.150(c)(8) (requiring court to consider evidence of substance abuse that directly impacts children's emotional or physical well-being).

[5] *See* AS 25.24.150(c)(2) (requiring court to consider evidence of parents' ability to meet children's emotional needs); AS 25.24.150(c)(6) (requiring court to consider parents' willingness and ability to foster a relationship between children and the other parent).

[6] *See* AS 25.24.150(c)(5) (requiring court to consider stability of child's living situation and "maintaining continuity").

[7] *See* AS 25.24.150(c)(6).

Finally the court considered whether there was evidence of domestic violence.[8]  It observed that both parents had contributed to a volatile and sometimes violent relationship, but found that the only incident of domestic violence conclusively established by the evidence was Jennifer's custodial interference.[9]  The court awarded sole legal custody and primary physical custody to Joseph.

Jennifer appeals.  She challenges what she perceives as the superior court's factual findings that she was abusive to Joseph and lied about her own abuse, that she coached her children, and that Joseph is a suitable caretaker.[10]

## III.  STANDARD OF REVIEW

"The superior court has broad discretion in its determinations of child custody.  We will not set aside the superior court's child custody determination unless its factual findings are clearly erroneous or it abused its discretion."[11]  "A factual finding is clearly erroneous when a review of the record leaves [us] with a definite and firm conviction that the superior court has made a mistake."[12]  "There is an abuse of discretion

---

[8]  *See* AS 25.24.150(c)(7) (requiring court to consider evidence of domestic violence either in proposed custodial household or between parents).

[9]  *See* AS 11.41.330 (defining custodial interference); AS 18.66.990(3) (defining domestic violence and crimes involving domestic violence); AS 25.90.010 (adopting AS 18.66.990's definition of domestic violence in custody disputes).

[10]  Jennifer's brief primarily relies on factual allegations not raised in the superior court.  We "will not consider on appeal new arguments which . . . depend on new . . . facts." *Kaiser v. Umialik Ins.*, 108 P.3d 876, 881 (Alaska 2005) (quoting *Krossa v. All-Alaskan Seafoods, Inc.*, 37 P.3d 411, 418-19 (Alaska 2001)).

[11]  *Moore v. Moore*, 349 P.3d 1076, 1080 (Alaska 2015) (quoting *Limeres v. Limeres*, 320 P.3d 291, 295-96 (Alaska 2014)).

[12]  *Angelica C. v. Jonathan C.*, 459 P.3d 1148, 1155 (Alaska 2020) (alteration (continued...)

if the superior court 'considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.' "[13]

## IV. DISCUSSION

### A. The Superior Court Did Not Find That Jennifer Abused Joseph.

Jennifer argues that the superior court erred by finding that she was abusive to Joseph and that she lied about Joseph's abusive behavior. But her argument is based on a false premise. The superior court did not resolve any of the parties' claims of physical abuse. And it did not find that Jennifer lied about Joseph's behavior. Instead, the court acknowledged that the marriage "appear[ed] to be a volatile relationship between the two parties, all too often physical." But it also stated that because "there are very competing versions of what happened," it could not "get to the bottom of any of those even by a preponderance [of the evidence]." The court found only that Jennifer's custodial interference constituted domestic violence under the custody statutes. Based on that finding, the court applied the statutory presumption that Jennifer, as a parent with a history of perpetrating domestic violence, could not be awarded custody of the children.[14] The hearing testimony supports the superior court's findings. And the record

---

[12]     (...continued)
in original) (quoting *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018)).

[13]     *Moore*, 349 P.3d at 1080 (quoting *Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014)).

[14]     AS 25.24.150(g) (establishing rebuttable presumption against awarding custody to parent with history of perpetrating domestic violence). The superior court reasoned that the statutory presumption applied because Jennifer's custodial interference involved three children and therefore counted as three incidents of domestic violence. The court also found that even if the presumption did not apply, its order was "justified
(continued...)

does not reflect that the court made or relied upon the kind of findings that Jennifer challenges. The court did not clearly err.

**B.** **The Superior Court Did Not Err By Finding Jennifer Had Manipulated The Children.**

Jennifer argues the superior court erred by finding that she "manipulated [her] children's mind[s] to hate Joseph." The superior court found that the children's fear of Joseph was due to Jennifer: "they would learn to hate him because of . . . the way that [Jennifer] has approached this."

The record supports the superior court's findings. Joseph testified that when he was awarded interim custody, the eldest daughter thought he "was going to kill them." He testified that if Jennifer had custody or unsupervised visitation he was afraid that the girls would "go back to thinking that I'm some kind of monster or that I want to hurt them." Jennifer did not directly refute these allegations. A review of the record simply does not lead to a definite and firm conviction that the court made a mistake by finding that Jennifer coached or manipulated the children after she removed them from Alaska in violation of the court's order.

**C.** **The Superior Court Did Not Err By Finding That Joseph Is A Suitable Caretaker.**

Jennifer also challenges the superior court's finding that Joseph is a suitable caretaker. The court found that both parents were capable of caring for the children's needs but that Joseph had "done a very, very good job over [the] past year of stepping up to the plate." The court also found that Jennifer's coaching and manipulation were detrimental to the children's emotional health. The court concluded that Joseph was

---

[14] (...continued) given all the other factors." Jennifer does not argue that the court made a legal error by applying the presumption so we do not address it.

"slightly better" able to care for the children.

The record supports the superior court's findings. At the time of the custody hearing, Joseph had been caring for the children for over a year. He testified that he took leave when he was first granted interim custody and "just spent time" working on their relationship. He arranged and participated in counseling for all of the children and testified that he had established a strong support network for himself and the children. He testified that there had been a complete change in the girls after "a rough go of it at first" and described the stable routine he had achieved with them. Joseph testified about his mental health struggles and his "almost 100 percent turn around" with treatment.

Jennifer did not directly refute Joseph's testimony, and she testified that she "can't speak to the last year." She opined that, although Joseph "has great potential" as a parent, she did "a better job" and the children excelled while under her care. The court reasonably discounted Jennifer's testimony, finding she lacked credibility. And it found that Jennifer's parenting was detrimental to the children's emotional health.

The superior court did not err by concluding that Joseph was "slightly better" able than Jennifer to meet the children's needs.

## V.    CONCLUSION

We AFFIRM the superior court's custody award.